## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

### CAPITAL CASE

**CIVIL ACTION NO. 99-678-C**

**PARRAMORE LEE SANBORN,**          **PETITIONER,**

**V.**          **<u>MEMORANDUM OPINION AND ORDER</u>**

**PHIL PARKER, WARDEN,**          **RESPONDENT.**

\* \* \* \* \* \* \* \* \* \* \*

This matter is before the court on Parramore Lee Sanborn's petition for a writ of habeas corpus under 28 U.S.C. § 2254 (DE 35). The court referred this matter to Magistrate Judge James D. Moyer, who issued a Report and Recommendation (DE 130) that Sanborn's petition be denied and that a certificate of appealability be issued as to whether Sanborn's Fourteenth and Sixth Amendment rights were violated when the trial court admitted the testimony of Reverend Barclay Brown into evidence. The court, having reviewed the record and being otherwise sufficiently advised, will grant the petitioner's application on the ground that the admission of Dr. Victoria Skelton's testimony violated the Sixth Amendment. On all other issues, the court will adopt the Magistrate Judge's Report, with modifications as discussed below, and grant a certificate of appealability as to whether the admission of Brown's testimony violated the Fourteenth and Sixth Amendments.

### <u>FACTUAL BACKGROUND</u>

The court adopts in full the Magistrate Judge's proposed findings of fact, critical portions of which are summarized as follows:

Sanborn was convicted of intentional murder, first-degree rape, first-degree sodomy, and first-degree kidnapping following a trial in the Henry Circuit Court. He was sentenced to death. Sanborn appealed his conviction, and the Kentucky Supreme Court reversed due to prosecutorial misconduct. *Sanborn v. Commonwealth*, 754 S.W.2d 534 (1988) ("*Sanborn I*"). The original trial judge recused himself and granted a change of venue, upon which the case was transferred to Jefferson County, where Special Judge William L. Shadoan presided over the second trial. Judge Shadoan overruled a motion for dismissal of the action or to prohibit the Commonwealth from seeking the death penalty. Jeff. Cir. Rec., Vol. I, p. 39, 35. The Kentucky Court of Appeals denied a petition for a writ prohibiting the retrial or the death penalty. *Sanborn v. Shadoan*, Case No. 90-CA-2110-OA (Ky. Ct. App. Dec. 18, 1990) (unpublished decision). The Supreme Court of Kentucky affirmed the denial of that petition. *Sanborn v. Shadoan*, Case No. 91-SC-083 (Ky. Mar. 14, 1991) (unpublished opinion). Sanborn filed Kentucky Bar Association ("KBA") complaints against his original defense counsel, Bette Niemi and Rob Riley, and they withdrew prior to the second trial.

Sanborn's second trial began on March 27, 1991; he was represented by Oleh Tustaniwsky. He was convicted of intentional murder, first-degree kidnapping, first-degree rape, and first-degree sodomy. Sanborn was sentenced to

death for intentional murder.

## I.   PROOF AT THE SECOND TRIAL

### A.   Guilt Phase

On October 12, 1983, Sanborn murdered and sexually assaulted Barbara Heilman.  Sheriff Ray Powell and Deputy Sheriff Franklin "Hoss" Sanders were dispatched to Ms. Heilman's home, where they found her car sitting in the driveway.  Tr. of Hr'g 4/1-2/91, p. 7.  They found hair curlers and a pair of eyeglasses just outside one of the car's doors and more curlers a few feet from the car.  *Id.*  There was also blood on the ground.  *Id.*  The gear-shift indicator had been ripped from the steering wheel, there were blood spots inside the car, the ignition was still in the "on" position, and the keys were covered with mud.  *Id.* at 7-8.  There was long hair wrapped around the turn signal on the steering column.  *Id.* at 7.  Detective Robert Perkins testified that some of the curlers on the ground had been stomped into the ground and that bobby pins and longs strands of hair were still attached to many of them.  Tr. of Hr'g 3/28/91, pp. 24, 26.  An umbrella was wedged into the driver's side door, and in addition to the ignition being "on," the transmission was in "drive."  *Id.* at 25-26.  Detective Perkins also found a small piece of human flesh on the armrest of the driver's door and a large amount of mud on the panel of the driver's door.  *Id.* at 27.  He also found blood in a grassy area about five feet from the rear bumper toward the home.  *Id.*

During the police canvas of the neighborhood, Sanborn answered the door at

3

the Carder home, and he invited them inside.[1]  Tr. of Hr'g 3/28/91, pp. 177-78.
Sanborn kept his hands tucked underneath his crossed arms while the officers were
speaking with him, so Officer Glen Smith shook Sanborn's hand and asked to
examine his hands.  *Id.* at 179.  Sanborn consented, and Smith observed blood
around Sanborn's cuticles and noticed streaks of blood on Sanborn's right pants'
leg.  *Id.* at 179-80.  After advising Sanborn of his constitutional rights, Smith asked
to see the clothes he had worn the previous evening.  *Id.* at 181.  When Sanborn
showed him his boots, Smith saw bloodstains on the right boot.  *Id.* at 182.
Officers who had remained outside saw a significant amount of blood in Sanborn's
car.  *Id.* at 35-36, 187, 190-91, 212-13.

Sanborn was taken into custody at approximately 12:50 p.m. on October
13, 1983.  *Id.* at 193.  Police officers swabbed Sanborn's mouth, penis, and
fingernails; collected hairs from his head; and took a blood sample.  *Id.* at 42, 67-
69; Tr. of Hr'g 4/1/91, pp. 26-28, 138.  Sanborn confessed that Ms. Heilman was
"hurt bad" and that he had left her near Sulphur Dam on Martini Lane in Henry
County, Kentucky.  Tr. of Hr'g 3/28/91, pp. 44, 198, 201.  When her body was
discovered approximately four to seven feet from the road, she was wearing only a
yellow blouse, a tan bra, and blue socks.  *Id.* at 50.  She had sustained multiple
stab wounds to the right side of her body, in her neck area, and in her left hip area.
*Id.* at 50-51.  Her shoes, jacket, jeans, and panties were found approximately three

---

[1] Sanborn lived with the Carders at the time.  Tr. of Hr'g 3/28/91, p. 55.

to four miles away on the following day.  *Id.* 217, 234-42; Tr. of Hr'g 4/1-2/91, p. 15.

Evidence was recovered from Sanborn's vehicle and home.  From his car, the police collected blood from the passenger seat, a blood-soaked paper towel from the passenger's side floorboard, hair, seat cushion foam, fibers from the car seat and carpet, and a towel with hair wrapped in it.  Tr. of Hr'g 3/28/91, pp. 57-59. There were also muddy footprints and scuffs on the passenger-side dashboard, and the passenger seat cover was torn and parts from that seat were lying loose on the front seat.  *Id.* at 57.  The trunk contained a red t-shirt, white jockey shorts, a blue flowered towel, a white towel, portions of the front seat cover, and a paper towel, all of which were soaked or smeared with blood.  *Id.* at 58-61.  From Sanborn's residence, the police took the boots and jeans he had worn the night of the murder, a Shrade lockback knife and sheath, a leather belt, several pocket knives, a Maxim hunting knife and sheath, and a stag-handled knife and sheath.  *Id.* at 58-61.

At the trial, a forensic scientist testified that fibers found on Ms. Heilman's blouse matched those from the car seat, seat cover, and bluish-green foam of Sanborn's vehicle.  Tr. of Hr'g 4/1/91, pp. 124-25.  Red fiber embedded in a pubic hair that was found in her mouth matched the fibers from the red t-shirt taken from Sanborn's car trunk.  *Id.* at 123.  Fibers from the t-shirt were also found on Ms. Heilman's panties.  *Id.* at 126.  The blue fibers found on her blouse matched the fibers from the carpet in Sanborn's car.  *Id.* at 122-23.  Other fibers from her

blouse matched the fibers from the white towel taken from the trunk of Sanborn's car. *Id.* at 124. Fibers from the victim's blouse were found on a piece of seat cover that was in Sanborn's trunk. *Id*. Fibers matching the carpet from Sanborn's car were found under Ms. Heilman's fingernails. *Id.* at 125. Finally, fibers found on her jacket matched the fabric taken from the seat of Sanborn's car.

A serologist testified that Sanborn's pubic hairs were found in Ms. Heilman's pubic area, between her lower lip and chin, on her blouse, and on her nose. *Id.* at 215-216. Two pubic hairs found inside her mouth were identified as hers, and two others were Sanborn's. *Id.* at 216. A hair from Sanborn's head was found on her blouse, and a hair from Ms. Heilman's head was found on a towel confiscated from Sanborn's car. *Id.* at 218. Ms. Heilman's blood was found on Sanborn's fingernails, his right palm and fingers, the white jockey shorts in his trunk, the buckle of the belt taken from his trunk, a Sharp knife and sheath and the Maxim hunting knife and sheath, the passenger seat in his car, the foam from the passenger seat in his car, and the paper towel found in his trunk, and also in the Heilmans' driveway. *Id.* at 194-98, 201, 205-09.

The Commonwealth's Assistant Chief Medical Examiner, Dr. Barbara Weakley-Jones, performed an autopsy on Ms. Heilman. Weakley-Jones testified that Ms. Heilman died from multiple stab wounds. Tr. of Hr'g 3/27/91, pp. 86-87. She had defensive wounds on her hands. *Id.* at 79. There were three postmortem stab wounds to her left side and back hip area, which were similar in location to

cuts found in the jeans she had been wearing that night.  *Id.* at 74-76, 103.

Organic material and leaves were found in the victim's vagina, indicating vaginal

penetration, although there was no sperm in or injury to her vagina or mouth, and

there was no evidence of trauma to her vagina.  *Id.* at 87-89.  Weakley-Jones

testified that the absence of vaginal injury is not inconsistent with the theory that

she was sexually assaulted while she was alive, given her age and marital status.

*Id.*

There was also testimony of incriminating statements, other than his

confession, that Sanborn made.  Rodney Tingle, who was incarcerated with

Sanborn, testified that during an altercation with another inmate, Sanborn had said

"I killed but once but they can't kill me but once."  Tr. of Hr'g 4/1/-2/91, p. 223.

Reverend Barclay Brown testified that, in response to his question whether Ms.

Heilman was alive when he raped her, Sanborn said, "Preacher, that doesn't make

any sense," and, "All I remember is, that she was screaming."  *Id.* at 235-37.

Sanborn moved for a directed verdict of acquittal on all charges at the close

of the prosecution's case, and the trial court denied the motion.  *Id.* at 249-57.

Although Sanborn had intended to establish that he had murdered Ms.

Heilman as a result of extreme emotional disturbance ("EED") through the

testimony of Dr. Phillip Johnson, the court prohibited Johnson from testifying to

the "triggering event" that purportedly caused the EED or to any "self-serving"

statements made by Sanborn.  Tr. of Hr'g 4/3/91, pp. 105, 108.  Johnson testified

7

by avowal.  *Id.* at 225-49; Tr. of Hr'g 4/3-4/91, pp. 4-86.  The evidence offered in Sanborn's defense consisted largely of his having been drinking the evening of the murder.  Tr. of Hr'g 4/3/91, pp. 19, 66.

Defense counsel moved for a mistrial based on an article in the *Louisville Courier-Journal* and a local television news story that stated that Donna Boyce, co-defense counsel, had stolen the prosecutor's voir dire notes at the beginning of Sanborn's second trial.  Tr. of Hr'g 4/3-4/91, p. 88.  The trial judge overruled the motion after he polled the jury and determined that none of the jurors had read the story or seen the broadcast.  *Id.* at 116.

The jury was instructed on rape, sodomy, and abuse of a corpse.[2]  The jury found Sanborn guilty of intentional murder, first-degree kidnapping, first-degree rape, and first-degree sodomy.  Tr. of Hr'g 4/4-5/91, pp. 18-22.  The jury fixed a sentence of 95 years each for kidnapping, rape, and sodomy.  *Id.*  The penalty phase for the capital murder conviction followed.

____B.    **Penalty Phase**

Sanborn did not testify during the penalty phase, although he offered several character witnesses.  Sanborn is the youngest of ten children, and two of his siblings, Clifford and Maxine, testified on his behalf.  Clifford, who is fifteen years older than Sanborn, testified that the family lived in a small fishing village and was

---

[2] Sanborn claimed that Ms. Heilman was dead at the time he sexually assaulted her and that he was guilty of abuse of a corpse rather than rape and sodomy.  Abuse of a corpse, unlike rape and sodomy, is not a statutory aggravator that invokes eligibility for the death penalty.

quite poor.  Tr. of Hr'g 4/5/91, pp. 5-6.  He stated that Sanborn's paternity was always questioned, and he described Sanborn as a loner who essentially raised himself.  *Id.* at 7.  He commented that Sanborn stuttered and was frequently teased because of his impediment.  *Id.* at 9.  Clifford described Sanborn's relationship with their older brother Jack as "the worst kind there could possibly be," because Jack was hostile and physically violent toward Sanborn.  *Id.* at 10, 13-14.  Maxine confirmed that Jack frequently humiliated Sanborn and that their mother never wanted him.  *Id.* at 8, 38, 42.

Doctor Johnson commented on the uncertainty of Sanborn's parentage and the abusive nature of his childhood environment.  Tr. of Hr'g 4/4-5/91, pp. 200-202.  Sanborn had no contact with his biological father, his mother was psychologically and physically abusive, and his brother Jack was physically and verbally abusive.  *Id.*  Johnson testified that Sanborn's stuttering was aggravated by stress and that he was teased about his problem as a child.  *Id.* at 203.  Johnson also opined that Sanborn suffered from poor self-esteem, did not feel valued, and drank to relieve his depression and social anxiety.  *Id.* at 208-212.  Johnson stated that Sanborn had poor impulse control when he was drinking alcohol.  *Id.* at 210.

Johnson diagnosed Sanborn with a full-scale IQ of 84, alcohol dependency, amphetamine abuse, antisocial personality disorder, and avoidant personality disorder.  *Id.* at 210, 214, 216.  Johnson's diagnosis of antisocial personality

9

disorder was rendered on the basis of Sanborn's inability to hold a job, conform to social and legal norms, honor financial obligations, remain faithful in relationships, or plan for his future. *Id.* at 219-20. He described Sanborn's irritability and aggression as also indicative of the disorder. *Id.* at 220. Johnson further testified that the disorder typically results in a lack of regard for the truth, physical recklessness, financial irresponsibility, and lack of remorse for wrongdoing. *Id.* at 220-24. Because of Sanborn's avoidant personality disorder, Johnson testified, he feels uncomfortable in social situations and is easily hurt by criticism or disapproval. *Id.* at 229.

According to Sanborn, said Johnson, Ms. Heilman's husand, Jack, was verbally abusive toward Sanborn and was unfair with regard to some financial arrangements. *Id.* at 232. Johnson believed that Sanborn's anger toward Jack Heilman was actually misplaced anger Sanborn felt toward his brother Jack. *Id.* at 253. Johnson believed this misplaced anger was a critical factor in Ms. Heilman's murder. *Id.* at 234. Johnson's testimony at the penalty phase as to Sanborn's account of Ms. Heilman's murder is substantially similar to the testimony he gave by avowal at the guilt phase, which is detailed below. Additionally, he testified that Sanborn denied that there was any sexual contact. *Id.* at 243. Johnson also related Sanborn's claim that Ms. Heilman had told Sanborn that if she ever died, she wanted to die naked in his arms; Johnson found that story to be "farfetched." *Id.* at 247.

Doctor Victoria Skelton, a forensic psychiatrist from the Kentucky Correctional Psychiatric Center, testified in rebuttal.  Much of her testimony is set out below, but the court notes here that Skelton stated that in one of Dr. Johnson's reports, Sanborn had claimed that his mother was "very loving," and refuted the claim that she had been physically abusive with the assertion that she had been a "strict disciplinarian." *Id.* at 94-95.  Skelton diagnosed Sanborn with alcohol dependency and amphetamine abuse, and she agreed with Johnson that he suffered from antisocial personality disorder. *Id.* at 102.  Although she agreed that Sanborn had traits that were consistent with avoidant personality disorder, she did not believe he suffered from the disorder itself, and she did not find any signs of major depression. *Id.* at 102-03.

The jury recommended that Sanborn be sentenced to death. *Id.* at 152.  The trial court conducted a sentencing hearing on May 14, 1991, and sentenced Sanborn to 95 years each on the counts of kidnapping, rape, and sodomy, for a maximum term of 285 years.  Tr. of Hr'g 5/14/91, p. 75.  The trial court sentenced Sanborn to death on the count of intentional murder. *Id.* at 77.

## II.   THE DIRECT APPEAL

The Kentucky Supreme Court affirmed the conviction and the imposition of the death penalty on direct appeal. *Sanborn v. Commonwealth*, 892 S.W.2d 541 (Ky. 1994) ("*Sanborn II*").

## III.   POST-CONVICTION PROCEEDINGS

11

Sanborn unsuccessfully sought post-conviction relief under Kentucky Rule of Criminal Procedure 11.42. *Sanborn v. Commonwealth*, 975 S.W.2d 905 (Ky. 1998) *as modified on denial of reh'g* ("*Sanborn III*").  Sanborn then filed the present federal habeas corpus petition, arguing that errors relating to both trials mandate federal habeas corpus relief.

## **LEGAL ANALYSIS**

In his petition for a writ of habeas corpus, Sanborn alleged the following points of error: (1) the admission of Rev. Brown's testimony violated the attorney-client privilege in contravention of his Fourteenth Amendment right to Due Process; (2) the admission of Brown's testimony violated the priest-penitent privilege and consequently the Fourteenth Amendment Due Process clause; (3) the admission of Brown's testimony violated his Sixth Amendment right to the effective assistance of counsel; (4) there was insufficient evidence for his conviction for rape and sodomy at the first trial; (5) his conviction for rape and sodomy at the second trial was not proper, because there was no evidence to corroborate Brown's testimony that Ms. Heilman was alive when she was sexually abused; (6) even if there was corroborating evidence that Ms. Heilman was alive, there was insufficient evidence at the second trial to support his conviction for rape and sodomy; (7) the court erred by excluding Dr. Johnson's testimony at the guilt phase of the second trial; (8) the court erred by admitting Dr. Skelton's testimony at the penalty phase of the second trial; (9) the court erred by admitting inflammatory and non-probative

12

evidence, including photographs of the Heilman farm in the spring, Sheriff Powell's testimony, the prosecution's description of Ms. Heilman, testimony from Ms. Heilman's daughter, and a photograph of Sanborn's penis following his arrest; (10) he was denied effective assistance of counsel, because Tustaniwsky conceded guilt but failed to present the EED defense during the guilt phase of the second trial; (11) his right to effective assistance of counsel was violated by Tustaniwsky's failure to prepare him for his sessions with Skelton; (12) appellate counsel's failure to raise the question of double jeopardy on direct appeal following the first appeal constituted ineffective assistance; (13) Niemi's failure to understand the scope of the attorney-client privilege with respect to Sanborn's relationship with Brown rendered her assistance ineffective; (14) the Department of Public Advocacy ("DPA") failed to provide him with representation; (15) the withdrawal of DPA attorneys without justification constituted ineffective assistance of counsel; (16) Tustaniwsky's representation was ineffective, because he admitted guilt without obtaining Sanborn's waiver of the presumption of innocence; (17) Tustaniwsky was ineffective based on his failure to investigate and present mitigating evidence; (18) he was deprived of effective assistance of counsel when Tustaniwsky failed to move for a continuance to investigate surprise prosecution witness Rodney Tingle; (19) the assistant defense counsel's conflict of interest compromised his right to effective assistance of counsel; (20) the cumulative effect of his attorneys' errors violated his right to effective assistance of counsel; (21) his rights were violated by

the court's denying him access to the KBA disciplinary files on Bruce Hamilton; (22) the second trial violated the constitutional guarantee against double jeopardy; (23) Detective Perkins's conduct at the second trial constituted prosecutorial misconduct; (24) the prosecution's argument on Sanborn's lack of remorse at the second trial amounted to prosecutorial misconduct; (25) the prosecution engaged in misconduct when it nullified the law on the EED defense at the second trial; (26) prosecutorial misconduct occurred when the prosecution improperly made arguments regarding the "Golden Rule" and the "heinous" nature of Sanborn's crimes at the penalty phase of the second trial; (27) the prosecution made improper arguments at the guilt phase of the second trial; (28) constitutional violations occurred during voir dire; (29) his confession was involuntary; (30) there was an unreasonable delay in presenting him to a judge following his arrest; (31) the jury instructions at the guilt phase of the second trial were improper; and (32) the cumulative effect of all errors rendered his trial unfair.

The Magistrate Judge recommended that Sanborn's petition be denied but that a certificate of appealability issue as to the Fourteenth and Sixth Amendment implications of the admission of Brown's testimony at the second trial (grounds 1, 2, and 3 below).

Sanborn objected to the Magistrate Judge's Report on the grounds that (1) the admission of Brown's testimony violated the attorney-client privilege in contravention of his Fourteenth Amendment right to Due Process; (2) the admission

14

of Brown's testimony violated the priest-penitent privilege and consequently the Fourteenth Amendment Due Process clause; (3) the admission of Brown's testimony violated his Sixth Amendment right to the effective assistance of counsel; (4) his conviction for rape and sodomy at the second trial was not proper, because there was no evidence to corroborate Brown's testimony that Ms. Heilman was alive when she was sexually abused; (5) even if there was corroborating evidence that Ms. Heilman was alive, there was insufficient evidence at the second trial to support his conviction for rape and sodomy; (6) the court erred by excluding Dr. Johnson's testimony at the guilt phase of the second trial; (7) the court erred by admitting Dr. Skelton's testimony at the penalty phase of the second trial; (8) he was denied effective assistance of counsel, because Tustaniwsky conceded guilt but failed to present the EED and "post-mortem sexual contact" defenses during the guilt phase of the second trial; (9) Niemi's failure to understand the scope of the attorney-client privilege with respect to Sanborn's relationship with Brown rendered her assistance ineffective; and (10) the second trial violated the constitutional guarantee against double jeopardy by subjecting him to retrial after his first conviction was reversed for prosecutorial misconduct.

When the parties to an action submit objections to the Magistrate Judge's report, the district court reviews the record *de novo*.  28 U.S.C. § 636(b)(1)(C). The district court judge may defer to the Report and Recommendation on the points to which there are no objections.  *Thomas v. Arn*, 474 U.S. 140 (1985).

I.    **STANDARD OF REVIEW**

Relief under 28 U.S.C. § 2254 is available only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A writ of habeas corpus shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or … was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The "contrary to" provision of the statute protects against rulings in which the state court "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or in which "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's ruling.  *Williams v. Taylor,* 529 U.S. 362, 405 (2000).

A state court's ruling violates the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  *Id.* at 407.  An unreasonable application can also occur where "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Id.*  Unreasonableness is an

16

objective standard, and the fact that another court has applied the law in the same manner is not dispositive. *Id.* at 409-10. "Unreasonable" is distinct from "incorrect;" even if a state court incorrectly applies a rule of law, that error will not warrant habeas relief unless the application was objectively unreasonable. *Mitchell v. Esparza,* 540 U.S. 12, 18 (2003). The Sixth Circuit has stated that "the district court could find the state court determinations unreasonable 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect,'" and its error "'would not be debatable among reasonable jurists.'" *Herbert v. Billy,* 160 F.3d 1131, 1135 (6th Cir. 1998).

Findings of fact made by the state court are presumed correct, and the applicant bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). When a federal habeas court concludes that the factual determinations are not supported by the record, it must give reasons for its determination. *Sumner v. Mata*, 449 U.S. 539, 549 (1981).

A constitutional error is harmless where it does not affect the ultimate result. *Mitchell,* 540 U.S. at 17-18.

## II.    SANBORN'S OBJECTIONS

### A.    Evidentiary Rulings

Rulings on the admissibility of evidence under state law are grounds for habeas corpus relief only where the violation of the state rule "has resulted in the denial of fundamental fairness, thereby violating due process." *Cooper v. Sowders*,

17

837 F.2d 284, 286 (6th Cir. 1988). Upon petition for habeas corpus, the reviewing court must conduct some examination of the merits of the claim, and the court will therefore address the correctness of the evidentiary ruling before determining whether the ruling deprived Sanborn of a fundamentally fair trial. *See Lott v. Coyle*, 261 F.3d 594, 607 n.6 (6th Cir. 2001) (some review of merits required); *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993) (reviewing merits of state ruling initially).

### 1.    Rev. Brown's Testimony

Reverend Barclay Brown is a United Methodist Minister. When Sanborn was indicted, Bette Niemi asked Brown if he would support an application for a change of venue, because Sanborn would be unable to receive a fair trial in Henry County. Tr. of Hr'g 3/25-27/91, p. 26. Brown says that he refused to support the motion. *Id.* at 70. In December 1983, Niemi asked him to serve as a defense expert regarding, among other things, a theological perspective of the death penalty and Sanborn's religious upbringing. *Id.* at 26; Niemi Aff. 3/24/91 (Jeff. Cir. Rec., Vol. V, at 707). Tustaniwsky also understood that "the minister had been somebody that Bette Niemi had asked to talk to Pat[3] with regard to testifying during the penalty phase of the first trial." Tr. of R.Cr. 11.42 Hr'g 8/12-13/96, p. 367. Niemi says that, at that point, "he agreed to assist us and help us in representing and defending Pat." Tr. of Hr'g 3/25-27/91, p. 26. Niemi specifically stated that

---

[3] The petitioner is known informally as "Pat."

the only reason she would have ever contacted Brown was to serve as a defense expert if they elected to pursue that approach at sentencing. *Id.* at 36.

Niemi testified that she told Brown that any information he received from Sanborn was privileged, he was considered to be part of the defense team, and he was not to discuss with Sanborn the facts surrounding Ms. Heilman's murder. Tr. of Hr'g 3/25-27/91, pp. 26-27; Niemi Aff. 3/24/91, at 708-09. Niemi also stated that she advised Sanborn that his conversations with Brown would be confidential. Niemi Aff. 4/4/91 (Jeff. Cir. Rec., Vol. IX, at 1277). Although Niemi's co-counsel, Robert Riley, was certain that confidentiality had been discussed with Brown, he could not recall any particular wording or conversation. Tr. of R.Cr. 11.42 Hr'g 8/12-13/96, p. 163. There is no documentation of the terms of the arrangement with Brown. Niemi did attend some of the meetings between Brown and Sanborn, but Brown testified that she did not attend all of them. Tr. of Hr'g 3/25-27/91, p. 76. Niemi recalled that the subject of the meetings she attended was Sanborn's life up to his arrest. *Id.* at 28. Riley recalled discussing with Brown in preparation for the trial things such as Sanborn's family, in relation to possible mitigation. Tr. of R.Cr. 11.42 Hr'g 8/12-13/96, p. 163.

Brown testified that Niemi asked him to determine whether Sanborn could show remorse. Tr. of Hr'g 3/25-27/91, p. 69; Jeff. Cir. Rec. Vol. VIII, p. 1099. Niemi denies that assertion. Niemi Aff. 3/24/91, at 709; Tr. of R.Cr. 11.42 Hr'g 8/12-13/96, p. 144. He also claimed not to remember being told that he was

expected to provide theological testimony, that he was part of the defense team, that he was expected to be called as a witness, that his communications with Sanborn were confidential, or that he was not supposed to ask Sanborn about Ms. Heilman's murder.  Tr. of Hr'g 3/25-27/91, pp. 71-78.  In January 1984, Neimi told Brown that he would not be called as a witness, and she stated in her affidavit that she thereafter reiterated the confidentiality expectation.  Id. at 29, 29; Niemi Aff. 3/24/91, at 708.

Despite the fact that Brown did not testify, "[o]ver the next weeks, before the hearings, and then during the pre-trial hearings and once during the trial itself, [he] talked with Pat about what he was feeling regarding the situation he was in (i.e. how he felt about being accused of murder.)."  Jeff. Cir. Rec., Vol. VIII, at 1099.  At that point, although Brown continued to talk to Sanborn, Niemi's relationship with Brown had terminated; nonetheless, she testified that she still considered him to be part of the defense team.  Tr. of Hr'g 3/25-27/91, p. 51. Sanborn was not a member of Brown's congregation, and, according to Brown, Sanborn never approached Brown "in [his] religious capacity to sort of make peace with [his] conscience and the Lord."  Id. at 78.  Niemi and Brown dispute whether he ever told her his opinion that Sanborn was not capable of showing remorse. Niemi Aff. 3/24/91, at 709; Jeff. Cir. Rec., Vol. VIII, at 1100.

After the Kentucky Supreme Court reversed Sanborn's first conviction and sentence, Brown contacted a county attorney, because some of the things Sanborn

said were troubling him.  Tr. of Hr'g 3/25-27/91, p. 81.  Per the county attorney's instruction, Brown wrote down what he remembered.  *Id.*  The prosecutor subsequently contacted Brown to tell him that he would be subpoenaed to testify in the retrial.  *Id.* at 82.  In a pretrial hearing, the trial court in the second trial ruled that Brown's testimony would be admissible.  *Id.* at 96.

At the second trial, Brown testified that he asked Sanborn whether he had raped Ms. Heilman and whether she was alive when he did so.  According to Brown, "He at first said, 'Preacher, that doesn't make any sense.'"  Tr. of Hr'g 4/1-2/91, p. 235.  Looking at the notes he had made after the reversal of Sanborn's first conviction, Brown testified that Sanborn answered, "All I remember is, that she was screaming."  *Id.* at 237.  Brown went on to say that Sanborn explained, "All I can remember is that my knife was bloody, I was bloody, I just wanted her to quit screaming, and so I guess that means that I did [the things of which I was accused]."  *Id.* at 238.  Regarding his feelings about his actions, Brown testified that Sanborn said he "felt about like a 50 -- empty 50-gallon drum;" he didn't really feel anything.  *Id.* at 239.  On cross-examination, Brown explained that he was praying with and ministering to Sanborn while he was having these conversations.  *Id.* at 243.

At the close of evidence, Tustaniwsky moved for a directed verdict on the rape and sodomy charges.  *Id.* at 251.  Tustaniwsky and Niemi argued that Brown's testimony did not indicate that Ms. Heilman was alive when the crimes

occurred, because Sanborn's answers had not been responsive to Brown's questions. *Id.* The prosecution relied on Brown's testimony that Sanborn had told him Ms. Heilman was screaming at the time, and the judge found that there was sufficient evidence to submit the case to the jury. *Id.* at 251-52.

Sanborn argues that the admission of Brown's testimony violated his rights under the Fifth, Sixth, and Fourteenth Amendments, because the ruling is contrary to the attorney-client and priest-penitent privileges. On direct appeal, the state Supreme Court held that Brown's testimony was admissible, because the statements "were not made with the clear understanding that they were confidential." *Sanborn II*, 892 S.W.2d at 550. Two justices dissented from that conclusion. *Id.* at 557-58.

### a. *Attorney-Client Privilege*

The Kentucky Supreme Court rejected Sanborn's claim that Rev. Brown's testimony was admitted in violation of the attorney-client privilege because the communications were not made with the understanding that they were confidential. *Sanborn II,* 892 S.W.2d at 550. The Court's conclusion was based primarily on the fact that Niemi intended Brown to be an expert witness. *Id.*

At the time of Sanborn's second trial, the attorney-client privilege in Kentucky was set out in K.R.S. 421.210(4), which provided that "[n]o attorney shall testify concerning a communication made to him, in his professional character, by his client or his advice thereon without the client's consent." The purpose of

22

the privilege is "to encourage a client to disclose fully the facts and circumstances of his case to his attorney without fear that he or his attorney will be compelled to testify as to the communications had between them." *Hughes v. Meade*, 453 S.W.2d 538, 540 (Ky. 1970) (quoting 16 A.L.R. 3d 1050). Application of the privilege is strictly limited to that purpose, because the exclusion of evidence is at odds with the principle that justice requires full disclosure of facts. *Id.*

The privilege attaches to an attorney-client communication when (1) the communication originated in confidence; (2) confidentiality was an essential factor in the relationship; (3) the community valued the relationship; and (4) the harm to the relationship from disclosing the content of the communication was greater than the benefit to be gained from disclosure. *Tabor v. Commonwealth*, 625 S.W.2d 571, 572-73 (Ky. 1981).

In addition to attorneys, the privilege protects communications made to third persons whose participation is essential to the legal services being rendered. 81 Am. Jur. 2d Witnesses, § 367. Several courts have extended the doctrine beyond attorneys and their staff when the policy underlying the privilege is served by doing so. *Asbury v. Beerbower*, 589 S.W.2d 216 (Ky. 1979) (applying privilege to communications between insured and insurer, where insurer was required to provide counsel); *Miller v. D. Ct. Denver, Co.*, 737 P.2d 834 (Co. 1987) (applying privilege to defense-retained psychiatrist hired to help enter plea and prepare for trial); *South Dakota v. Rickabaugh*, 361 N.W.2d 623 (S.D. 1985) (applying

23

privilege to polygraph administrator hired by defense counsel); *Illinois v. Knippenberg*, 362 N.E.2d 681 (Ill. 1977) (applying privilege to investigator employed by defense attorney).

Where an insurance policy requires the insured to cooperate with the insurer, and the insurer is obligated to provide legal representation for the insured, communications are treated as privileged, because "the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured." *Asbury*, 582 S.W.2d at 217 (*quoting Illinois v. Ryan*, 197 N.E.2d 15, 17 (1964)). The court in *Rickabaugh* found that a polygraph examiner was the representative of the defense counsel, because the attorneys had

> agreed that if Rickabaugh passed the polygraph test, the State would not continue its investigation. Because [defense counsel] was not qualified to determine the truthfulness of Rickabaugh's statements through a scientific method, he hired [the polygraph examiner]. *As a result of his expertise [the polygraph examiner] was instrumental in assisting [counsel] in rendering legal services to Rickabaugh*.

*Rickabaugh*, 361 N.W.2d at 625 (emphasis added). The court also found that the defendant had a reasonable expectation that his answers would not be disclosed outside the context of his legal representation, because the defense attorney had sent a letter to his client stating his intention that neither the statements made during, nor the results of, the examination could be used as evidence. *Id.* As indicated by the explanation provided in these and similar cases, the privilege may

24

be extended where a third person retained by a defense attorney fulfills a role that is essential to the representation and could not be performed by the attorney himself.

Whether the attorney-client privilege extends to communications made to an expert retained by defense counsel may depend on the role the expert is intended to fill. JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE, pp. 503-36 (1989). An expert retained to testify at trial is not the lawyer's representative, and, because disclosure is necessarily contemplated in the relationship, the privilege does not apply. *Id.* If the expert is instead intended to serve as a consultant or advisor to the attorney, the privilege will protect statements made to him by the client. *Id.* If the privilege did not extend to a non-testifying expert, "[b]y consulting the expert, the client may be creating an opposing witness ... [who] can testify to one of the most prejudicial types of evidence, an admission from the client's own mouth." Edward J. Imwinklereid, *The Applicability of the Attorney-Client Privilege to Non-Testifying Experts: Reestablishing the Boundaries Between the Attorney-Client Privilege and the Work Product Protection*, 68 WASH. U.L.Q. 19, 27 (Spr. 1990).

The party requesting the exclusion of evidence based on privilege bears the burden of establishing the applicability of the privilege. *Lexington Public Library v. Clark,* 90 S.W.3d 53, 62 (Ky. 2002) (citations omitted). Sanborn urges that whether the conversations were meant to be kept confidential should be

25

determined from his perspective.  *See Sanborn II,* 892 S.W.2d at 557 (Stumbo, J., dissenting); *Blackmon v. Alaska*, 653 P.2d 669, 672 (Ak. 1982) (client's intent governs whether attorney-client conversation was confidential); *Gonzales v. Municipal Court,* 67 Cal. App. 3d 111, 136 Cal. Rptr. 475, 481 (Cal. App. 1977) (confidentiality determined from perspective of person making statement).  Sanborn also argues that the confidentiality expectation is statement-specific.  Therefore, he proposes, even if expert testimony could not be expected to be kept secure, to the extent that Brown's testimony went beyond the scope of his originally anticipated testimony and into the facts surrounding and Sanborn's reaction to Ms. Heilman's murder, Sanborn and his counsel would have had no reason to expect that they would be disclosed.  The court finds, however, that the confidentiality expectation pertains to the relationship as a whole, rather than to a given statement.  *See Harris v. Commonwealth*, 688 S.W.2d 338, 340-41 (Ky. Ct. App. 1984) ("*all* contact between a party and his counsel in his professional capacity must be deemed in anticipation of litigation or in furtherance of the legal services being offered.  Consequently, there can be no division of the association into privileged and non-privileged categories.").  This approach is consistent with the policy behind the privilege, because it allows free communication without necessitating constant reconsideration of the import of its content.  The court also recognizes that one person may fill different roles vis-a-vis another, and that the context in which each role is played may be treated as a distinct relationship.

There is no dispute that Brown's assistance was initially sought to develop and assess evidence of mitigating circumstances that would have a favorable impact on Sanborn's ultimate sentence.  The facts that form the basis of an expert's opinion must be disclosed to the jury. *Alexander v. Swearer*, 642 S.W.2d 896, 897 (Ky. 1982).  Experts are also subject to cross-examination on the facts that support their conclusions. *Buckler v. Commonwealth*, 541 S.W.2d 935, 939 (Ky. 1976).  Therefore, at least when the relationship began, any expectation that conversations between Sanborn and Brown would remain confidential was unreasonable, because such protection would have been contrary to the uncontradicted purpose for which they were occurring.  The attorney-client privilege is therefore inapplicable to Sanborn's statements to Brown that were made for the purpose of developing his potential expert testimony.

When, in January 1984, Niemi made and communicated the decision not to use Brown as an expert, the original arrangement terminated, and, per Brown's request, a new relationship commenced.  However, there is no reason to believe that Brown continued to serve as a member of the defense team in an advisory capacity instead of his previous role as an expert; Niemi even testified that she never would have contacted Brown if she had not anticipated presenting theological evidence at the penalty phase through his expert testimony.  According to the record, Brown asked to continue speaking with Sanborn about how he felt about his situation, and his presence appears to have been only for the purpose of praying

with and ministering to Sanborn throughout the remainder of the proceedings. Niemi did not seek out those services.  His continued relationship was not relevant, much less essential, to Sanborn's legal representation, and there is therefore no reason to apply the attorney-client privilege to communications that occurred beyond that point.

Having decided that Sanborn has not satisfied his burden of proving that his conversations with Rev. Brown originated with an expectation of confidentiality, the court need not address the remaining three elements required for application of the attorney-client privilege.  The court finds that the admission of Brown's testimony did not violate the attorney-client privilege, and the court need not address whether the introduction of that testimony deprived Sanborn of a fundamentally fair trial in violation of his right to due process.

> b.    *Priest-Penitent Privilege*

The priest-penitent privilege applicable at the time of Sanborn's trial provided:

> nor shall an ordained minister, priest, rabbi or accredited practitioner of an established church or religious organization be required to testify in any civil or criminal case or proceedings preliminary thereto, or in any administrative proceeding, concerning any information confidentially communicated to him in his professional capacity under such circumstances that to disclose the information would violate a sacred or moral trust, unless the person making the confidential communication waives such privilege herein provided.

K.R.S. § 421.210(4).  The four-part test propounded by the court in *Tabor* also

28

applies to the priest-penitent privilege.  Communication with a religious figure is privileged when (1) the communication originated in confidence; (2) confidentiality was an essential factor in the relationship; (3) the community valued the relationship; and (4) the harm to the relationship from disclosing the content of the communication was greater than the benefit to be gained from disclosure.  *Tabor,* 625 S.W.2d at 572-73.  Because Sanborn is asserting the privilege, he bears the burden of establishing that all four elements exist.  *Lexington Public Library,* 90 S.W.3d at 62 (citations omitted).

Communications made to a religious advisor in his spiritual role must be differentiated from those made to someone acting as a friend or in any other capacity.  *Wainscott v. Commonwealth*, 652 S.W.2d 628, 632-33 (Ky. 1978). The privilege will not protect communications, "however confidential, when not made in connection with or in discharge of some such supposed religious duty or obligation, or when made to [religious advisors] while in the discharge of duties other than those which pertain to the office of a clergyman." *Johnson v. Commonwealth*, 221 S.W.2d 87, 89 (Ky. 1949) (*quoting* 58 Am. Jur., Witnesses § 532).  Like the attorney-client privilege, the priest-penitent privilege is strictly construed.  *Id.*  The court in *Johnson* found the privilege inapplicable where the defendant was not a member of the clergyman's church, because the statement was not related to the church's discipline.  *Id.*

The Kentucky Supreme Court found that the fact that Brown was originally

retained as an expert witness weighed against finding that statements made to him were intended to be confidential and indicated that he was not acting in his capacity as a minister when he engaged in conversation with Sanborn. *Sanborn II,* 892 S.W.2d at 550. This court, however, as previously stated, finds that Brown's relationship with Sanborn as an expert is distinct from his later relationship; the purpose for which Niemi originally sought his assistance is irrelevant to the reasons for which Sanborn continued to speak with him after Niemi no longer required his services. The Kentucky Supreme Court also noted that there was no evidence that Sanborn consulted Brown on spiritual matters. *Id.*

Sanborn argues that the privilege should be applied on a statement-specific basis, that he expected that his statements to Brown regarding whether Ms. Heilman was alive when he engaged in sexual acts would be treated as confidential, and that those statements otherwise satisfy the criteria set forth in *Tabor.* As discussed above in relation to the attorney-client privilege, the court will determine whether a relationship as a whole, rather than an isolated statement, carried with it a reasonable expectation of security.

The court has already determined that there could not have been a reasonable expectation of confidentiality during the time period in which Brown was expected to testify as an expert at the penalty phase of Sanborn's trial, because the use of expert testimony necessarily contemplates the disclosure of the facts underlying his opinions. Therefore, to the extent that the contested statements

30

were made prior to the decision not to pursue that line of mitigation, the priest-penitent privilege does not render them inadmissible.

Brown confirmed that, immediately preceding and during the trial, he was ministering to and praying with Sanborn and the defense team. Thus, although he may not have been approached in his religious capacity, the court must determine whether Sanborn had a penitential relationship with Brown.

According to the record, Sanborn did not come to Brown in hopes of making peace with God, and there is no indication that Sanborn sought out Brown's spiritual guidance in any other capacity. Brown actually recalled Sanborn's becoming agitated when he asked Sanborn about the Heilman family. Jeff. Cir. Rec., Vol. VIII, at 1098-1100. The fact that Brown injected prayer and ministering into the relationship does not mean that Sanborn understood that his statements to Brown were protected by a "sacred or moral trust," and the facts simply do not support an assertion that Sanborn had such an understanding. The petitioner's affidavit from Rev. Dr. Dianne Reistroffer (DE 66, Ex. 1), stating that the conversations between Brown and Sanborn was were within the Methodist church's philosophy and that Brown was acting within his religious capacity in counseling Sanborn does not supply the missing "sacred or moral trust." Even assuming, in retrospect, that Brown's relationship with Sanborn was consistent with his religious position, that fact does not pertain to the circumstances under which the relationship arose or Sanborn's perception of the relationship. Therefore,

31

the court finds that Sanborn has failed to establish that his statements to Brown are encompassed by the priest-penitent privilege.

Having decided that Sanborn has not satisfied his burden of proving that his conversations with Brown were in the context of a penitential relationship, the court need not address the remaining elements required for application of the priest-penitent privilege.  The court finds that the admission of Brown's testimony did not violate the priest-penitent privilege, and the court need not address whether the introduction of that testimony deprived Sanborn of a fundamentally fair trial in violation of his right to due process.

### 2.    Sufficiency of the Evidence at the Second Trial

Tustaniwsky conceded in his opening statement at the penalty phase of Sanborn's retrial that Sanborn sexually assaulted Ms. Heilman, but he contended that she was dead at the time.  Rape is defined as "sexual intercourse with another person by forcible compulsion."  K.R.S. § 510.040(a).  Sodomy is "deviate sexual intercourse with another person by forcible compulsion."  K.R.S. § 510.070(1).  "Deviate sexual intercourse" is "any act of sexual gratification involving the sex organs of one (1) person in the mouth or anus of another."  K.R.S. § 510.010(1).

Sanborn argues that there was not sufficient evidence to prove that Ms. Heilman was alive when he sexually assaulted her and that his convictions for rape and sodomy and consequently the imposition of the death penalty must be reversed.  On review of a claim of insufficient evidence, "the relevant question is

32

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Kentucky Supreme Court did not address this argument, finding that it did not present a "relatively serious" question or cause "real concern." *Sanborn II,* 892 S.W.2d at 546.

a.   *Corroboration*

Reverend Brown's testimony relayed to the jury Sanborn's admission of a necessary element of both rape and sodomy, and Sanborn contends that, even if it was properly admitted, the federal rule requiring evidence to corroborate admissions was not satisfied. Where an admission is admitted as evidence in federal court, the federal corroboration rule requires that it be supported by independent evidence sufficient to raise an inference that the admission is true. *Opper v. United States,* 348 U.S. 84, 93 (1954)*; United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988); *United States v. Dickerson*, 163 F.3d 639 (D.C. Cir. 1999)*.* The corroborating evidence need not, standing alone, prove each element beyond a reasonable doubt. *Blades v. Commonwealth*, 957 S.W.2d 246, 250 (Ky. 1998).

Corroboration is not required by the federal Constitution. *Williams v. Chapleau*, 2000 U.S. App. LEXIS 195, at *9 (6th Cir. Jan. 4, 2000); *Lucas v Johnson*, 132 F.3d 1069, 1078 (5th Cir. 1998); *Aschmeller v. South Dakota*, 534 F.2d 830, 831 (8th Cir. 1976). A state court's violation of a rule that is not

imposed by the Constitution or a federal law does not warrant federal habeas relief. *See* 28 U.S.C. § 2254(a). Because there is no constitutional corroboration requirement, sufficiency of the evidence in a habeas appeal is subject only to the *Jackson* standard. Assuming that Brown's testimony was admissible, his testimony alone could justify the conclusion that Ms. Heilman was alive at the time of the abuse.

### b.   Sufficiency of the Evidence

Sanborn argues that if the admission of Brown's testimony was improper, there was insufficient evidence to sustain his rape and sodomy convictions.[4] Substantial and competent circumstantial evidence is sufficient to support a conviction, even without eliminating all other possible conclusions. *United States v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999). If the evidence is inconclusive, a reviewing court must presume that any conflicting inferences were resolved in the state's favor. *Thompson v. Nagle*, 118 F.3d 1442, 1448 (11th Cir. 1997). The court has adopted the Magistrate Judge's statement of the facts and also adopts his characterization of the evidence presented at trial.

Excluding Brown's testimony, evidence from which the inference that Ms. Heilman was still alive when Sanborn sexually abused her includes the following: Sanborn told the police that he did not know whether she was alive or dead when he left her, but she was "hurt bad." Both Sanborn's and Ms. Heilman's pubic hairs

---

[4] The court has already determined that Rev. Brown's testimony was properly admitted.

were found in her mouth, suggesting that he gagged and raped her before sodomizing her; because there would have been no reason to gag her if she was dead, this indicates that she was alive at least when he raped her.  There were fibers from his car found underneath her fingernails, indicating that she was alive at least when she was forced into his car.  Her curlers had been pulled from her head, which would be consistent with his having grabbed her head to force her to sodomize him orally.  An abrasion on his penis suggested that she struggled during the sexual assault.  Dr. Weakley-Jones testified that the lack of vaginal injury is not conclusive proof that she was dead before he penetrated her vagina.  Ms. Heilman had defensive wounds on her hands, which is evidence that she was alive when the attack began.

There also exists significant evidence that tends to contradict the conclusion that Ms. Heilman was alive at the time of the sexual assault.  The most convincing evidence is that three post-mortem stab wounds sustained to Ms. Heilman's left side and back hip area coincided with the location of cuts in the jeans she had been wearing.  If Sanborn sexually abused her vaginally while she was alive, the cuts in her jeans suggest that he had to pull her jeans back over her hips after raping her, stab her through her jeans after she died, then remove her jeans again to leave them where they were ultimately found, three to four miles from her body.  In addition, organic materials and leaves were found in Ms. Heilman's vagina, which indicates that the vaginal penetration occurred outside as opposed to inside his car.

Finally, the lack of injury to her mouth and vagina suggests that she was not resisting the sexual acts because she was already dead.

Although the court finds that there is significant evidence that Ms. Heilman was dead when Sanborn sexually assaulted her, whether *this* court believes the evidence at trial established all elements of the crime beyond a reasonable doubt is irrelevant. *See Jackson,* 443 U.S. 307, 318-19 (*quoting Woodby v. I.N.S.*, 385 U.S. 276, 282 (1966)).  The reviewing court is specifically precluded from making its own subjective determination of guilt or innocence and from scrutinizing the fact-finder's rationale. *Id.* at 319 n.13.  The court thus finds that, even without Brown's testimony, when the evidence is viewed in the light most favorable to the prosecution and when all conflicting inferences are drawn in the prosecution's favor, a reasonable juror could conclude that Ms. Heilman was alive when Sanborn sexually abused her.  Therefore, Sanborn's claim based on the sufficiency of the evidence at the second trial is denied.

### 3.    Exclusion of Dr. Johnson's Testimony

The EED defense is defined as

> a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes.  It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under

36

circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986).  The EED

defense cannot be successful unless there is "a showing of some dramatic event

which creates a temporary emotional disturbance as opposed to a more generalized

mental derangement."  *Stanford v. Commonwealth*, 793 S.W.2d 112, 115 (Ky.

1990).

Sanborn sought to introduce evidence of the requisite dramatic event

justifying his alleged EED through the testimony of Dr. Johnson, who first would

have recounted Sanborn's description of events on the night Ms. Heilman was

killed and then would have offered his interpretation of Sanborn's statements.[5]

---

[5] On avowal, Johnson offered the following account of Sanborn's statements
to him:

> During our second interview here just a few weeks ago,
> Sanborn told me that he and Barbara Ms. Heilman had been
> romantically involved for, I think, about a two-year period of
> time, and that his romantic involvement played some role,
> a significant role, in Barbara Ms. Heilman's death.
>                    * * * *
> Okay.  It's Sanborn [sic] contention that on the night
> that Barbara Ms. Heilman died that he had been drinking for
> a considerable period of time, traveling back and forth
> through the county, often times buying more alcohol.
> Sanborn says that his truck -- I'm sorry, his car, automobile,
> flooded out in front of the Ms. Heilman home, he pulls up
> into the driveway and he goes to ask  Ms. Heilman to give
> him a ride home.  She supposedly agrees to do this, and in
> the process of pulling out of the driveway that she begins
> to initiate behaviors which I'll simply describe as romantic
> behaviors.
>  Sanborn contends that he did not reciprocate those
> types of feelings on that particular occasion; that she
> persisted; that he was simply interested -- that he was very

However, the trial court ordered that Johnson's testimony as to the triggering event was inadmissible hearsay, because there was no other evidence that the events actually occurred, and it would essentially have allowed Sanborn to offer his version of the story without being subject to cross-examination.  Tr. of Hr'g 4/3/91, pp. 105-106, 108.  Sanborn contends that the trial court's exclusion of Johnson's testimony was contrary to Kentucky evidentiary law and deprived him of

---

> intoxicated and simply interested in going home, that she perhaps took some offense to this, but the -- what I guess would be called more normal kinds of romantic behaviors escalated or changed in tone and she began to tease him a little about it.  The teasing escalated.  And we're talking about just within a very short period of time, perhaps minutes, and then she finally, according to  Sanborn, mocked him for stuttering.  Sanborn contends at that point that he lost control.
>
> * * * *
>
> ...  Sanborn contends that when he refused or declined  Ms. Heilman's affectations that she made a comparison between her husband and  Sanborn in that neither one of them were interested in romance when they had been drinking.
>
> * * * *
>
> [Then] there was some, you know, pulling of the hair by  Ms. Heilman, flipping of the ear, that sort of thing.  And then when it sort of -- it escalated.  And it's my understanding that sort of the final straw from  Sanborn [sic] retrospective look at this situation was when she mocked his stuttering and made this comparison to Jack Ms. Heilman.  It was at that point that  Sanborn says that he lost control.  He doesn't remember physically attacking her, but on the other hand says that he must have done that.  He does not remember stabbing her, but acknowledges that he must have stabbed her in that process.

Tr. of Hr'g 4/3-4/91, pp. 16-19.

a fundamentally fair trial.

As an exception to the hearsay rule, Kentucky law provides that

> an expert may properly express an opinion based upon information supplied by third parties which is not in evidence, but upon which the expert customarily relies in the practice of his profession.... [T]he type of information which can be utilized by the expert in forming his opinion should be only that produced by qualified personnel and on which the expert would customarily rely in the day-to-day decisions attendant to his profession.

*Buckler v. Commonwealth,* 541 S.W.2d 935, 939 (Ky. 1976). The *Buckler* court also recognized that the hearsay rule is typically relaxed only where there exists "a necessity for the admission of the evidence in its hearsay form, and a circumstantial guarantee of the trustworthiness of the offered evidence." *Id.* at 937 (*citing* 29 Am. Jur. 2d, Evidence, § 496 (1967)). Although the Kentucky Rules of Evidence had not been adopted at the time of Sanborn's second trial, K.R.E. 703 codifies the rule announced in *Buckler*. ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK, § 6.25[2], p. 461 (4th ed. 2003).

> (a) The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

> (b) *If determined to be trustworthy*, necessary to illuminate testimony, and unprivileged, facts or data relied upon by an expert pursuant to subdivision (a) may at the discretion of the court be disclosed to the jury even though such facts or data are not admissible in evidence.

K.R.E. 703 (emphasis added).  The reasoning in *Buckler* and its codification in
K.R.E. 703 demonstrate the requirement that hearsay evidence relied on by an
expert is inadmissible *unless* it is sufficiently trustworthy.

In Johnson's testimony at the penalty phase, he stated that he takes into
consideration information provided to him through his conversations with his
patients.  Tr. 4/4-5/91, at 255-57.  How much weight he attributes to it depends
on whether it is noteworthy or a valid assertion.  *Id.* at 256.  In his avowal at the
guilt phase, he also explained that he does not seek to determine the veracity of a
patient's story, but rather to use that information to assess the patient's mental
state at the time the events occurred.  Tr. of Hr'g 4/3-4/91, at 45-48.

Sanborn's objection to the Magistrate Judge's conclusion on this claim
focuses on his argument that, as required by *Buckler*, a psychiatric patient is a
qualified source for information on which a psychiatrist may base his expert opinion
as to the patient's mental condition, and psychiatrists customarily rely on their
patients' statements in making such assessments.  Sanborn's argument is without
merit.  The Kentucky Supreme Court found that the trial court was justified in
excluding Johnson's testimony because there was no independent evidence of the
triggering event and because Johnson doubted the veracity of Sanborn's
statements.  The Magistrate Judge's recommendation that this claim be denied is
premised on the determination that Sanborn's statements to Johnson lacked the
trustworthiness required to allow the hearsay information on which an expert has

40

relied in forming his opinion to be admitted as evidence.  The court, after reviewing the record *de novo*, concurs in the Magistrate Judge's reasoning and conclusion, and Sanborn's claim that his Fourteenth Amendment right to due process was violated when the trial court excluded Johnson's testimony will be denied.

**B.     Governmental Interference with the Right to Effective Assistance**

Where government conduct causes substantial detriment to the attorney-client relationship, it can violate a defendant's right to effective assistance of counsel.  *Weatherford v. Bursey*, 429 U.S. 545 (1977).  Relief is warranted only where the attorney-client privilege is breached *and* the balance drawn by the state in reaching its ruling "was so detrimental to the attorney's effective representation of his client as to be prohibited by the Sixth Amendment."  *Noggle v. Marshall,* 706 F.2d 1408, 1415 (6th Cir. 1983).

**1.     Inclusion of Rev. Brown's Testimony**

Sanborn argues that he was denied effective assistance of counsel because the government's use of Rev. Brown's testimony at his second trial improperly interfered with his relationship with his attorney.  Because he concluded that Sanborn's converstaions with Brown were not privileged, the Magistrate Judge recommended that this claim be denied.

The government-interference theory of violation of the right to effective assistance presumes that the government obtained privileged information that was essential to the attorney-client relationship.  *See Estelle v. Smith*, 451 U.S. 454

41

(1981) (court-retained psychiatric expert for purposes of competency evaluation called by prosecution at sentencing); *Weatherford*, 429 U.S. 545 (undercover agent attended meetings between defendant and defense attorney); *United States v. Steele,* 727 F.2d 580 (6th Cir. 1984) (undercover agent overheard conversations between defendant and defense attorney in jail); *Noggle*, 706 F.2d 1408 (medical expert originally retained by defense counsel and called by government in response to defendant's insanity plea).  The communications in question in each of these cases were protected by the attorney-client privilege.  The physician-patient privilege also applied in *Noggle* and *Estelle*.

Sanborn contends that his attorney created the relationship with Brown so that Brown could advise counsel whether Sanborn should testify, and that their communications were therefore confidential.  The court has already determined that, based on Niemi's statements, Brown's assistance was obtained so that he might offer expert testimony at the penalty phase, and any communications made to him by Sanborn were necessarily made with knowledge that they might be disclosed.  Because those conversations were not made within the context of the attorney-client privilege or with a reasonable expectation of confidentiality, their disclosure did not interfere with the attorney-client relationship.  The court has already concluded that Sanborn's statements were not protected by the priest-penitent privilege; in any event, any relationship he had with Brown in his capacity as a minister was irrelevant to Sanborn's legal representation, and interference with

42

that relationship therefore could not compromise Sanborn's right to effective assistance.  Because his conversations with Brown were not subject to protection as integral to the attorney-client relationship, Sanborn's argument that the government improperly interfered with his Sixth Amendment right to effective assistance is unavailing.  The court need not address the balance struck by the state court in admitting Brown's testimony.

<u>2.    Inclusion of Dr. Skelton's Testimony</u>

The trial court directed that Dr. Skelton examine Sanborn after the defense gave notice that it would be presenting the EED defense.  Skelton's records indicate that in their first meeting, on Friday, March 8, 1991, Sanborn denied having even been near Ms. Heilman when she was murdered.  Jeff. Cir. Ct. Rec., Vol. IV, DE 110, at 1.  When they met again the following Monday, according to Skelton, "he wanted to clarify what he had told [her] on Friday, and instead stated that yes he had been with the victim of the alleged charges." *Id.*  Sanborn gave Skelton an account similar to what he had told Dr. Johnson, including that he "cannot remember much of anything else except that there was a struggle, which he cannot remember much details about," and "he remembers he had his knife out, though he didn't remember when the knife came out or why he ever pulled the knife out." *Id.* at 3.  When Skelton asked Sanborn why he hadn't told that version of the story at their first meeting, "he said, 'I was going to and somehow or another I got off onto something else.'" *Id.* at 4-5.  She asked whom he had seen between their

43

meetings, and he admitted he had consulted with Tustaniwsky.  *Id.* at 5.  When

she asked him about his defense strategy, he told her that he intended to claim that

he had committed his acts under emotional distress.  *Id.*

At the penalty phase of Sanborn's second trial, Skelton was called as a

witness for the prosecution to rebut Johnson's testimony that Sanborn acted under

EED; Skelton testified as to the inconsistent stories Sanborn told her.  Tr. of Hr'g

4/5/91, p. 80.  At sidebar, Tustaniwsky objected "to any testimony about the fact

that I visited [Sanborn] between the two visits because that is no business of the

jurors when I visited my client and second of all, it's clearly being introduced for the

inference that I had -- that I coached him into changing his story."  *Id.* at 87.  The

judge instructed the prosecutor not to elicit the names of anyone with whom

Sanborn had contact between the meetings, but he allowed counsel to ask what

Sanborn had said about his strategy.  Tape 16, 4/5/91, 20:01:02.  The questioning

proceeded as follows:

> Q:  Dr. Skelton, don't give me any names of anybody
> you talked to.  Okay?  Did you ask him if he had
> talked to anyone between the 8th and 11th?  What
> did he say?  Yes or no?  Just answer yes or no.
>
> A:  Yes.  He said yes.
>
> Q:  And after he gave you that answer, did you ask
> him anything about his strategy?
>
> A:  Yes.
>
> Q:  Just tell me what he said his strategy was.

A:     That the act was done under emotional distress.

Tr. of Hr'g 4/5/91, p. 91.  At Tustaniwsky's request, the attorneys approached the bench, and Tustaniwsky moved for a mistrial, arguing that "the answer [ ] Mr. Jasmin elicited clearly implies that the attorney came to visit Mr. Sandborn [sic] between the two visits." *Id.*  The judge overruled the objection. *Id.*  Skelton concluded that, based on the information she had, Ms. Heilman's murder was "contemplated" or "premeditated." *Id.* at 107-08.

Sanborn claims that Skelton's testimony constituted an unconstitutional governmental interference with his relationship with his attorney.  He contends that Skelton's testimony drew attention to the fact that Sanborn changed his story after consulting with someone, and the jury would have reasoned that he and/or defense counsel had fabricated a story to support the EED theory.  He further contends that the admission of Skelton's testimony is not justified by his having raised the EED defense, because the exclusion of Johnson's testimony at the guilt phase crippled that approach.

As previously specified, government conduct can violate a defendant's right to effective assistance of counsel when it causes a substantial detriment to the attorney-client relationship. *Weatherford*, 429 U.S. 545.  Relief is warranted only where the attorney-client privilege is breached *and* the balance drawn by the state in reaching its ruling "was so detrimental to the attorney's effective representation of his client as to be prohibited by the Sixth Amendment." *Noggle v. Marshall,* 706

45

F.2d 1408, 1415 (6th Cir. 1983).  "[T]here is no necessary inference of prejudice to be drawn from the government's intrusion into the relationship between a defendant in a criminal case and his attorney; there must be a showing of prejudice as well as a showing of intrusion."  *Bishop v. Rose*, 701 F.2d 1150, 1156 (6th Cir. 1983).  The court will consider these elements – intrusion and prejudice – in turn.

a.   Weatherford's *First Prong: Intrusion*

With regard to the first prong of the *Weatherford* analysis, the court finds that Skelton's questioning of Sanborn regarding his meeting with his attorney was an intrusion into the attorney-client relationship.  Sanborn waived his right to refuse to submit to an independent psychological consultation when he decided to present psychological evidence, and Skelton's opinion rebutting the EED defense was therefore proper.  *Noggle,* 706 F.2d 1408 (defense-retained expert's testimony for prosecution on sanity issue admissible).  It was also proper for her to consider his changed version of the events in question and his statement that he "was going to" tell her the revised version at their initial meeting but "somehow or another [he] got off onto something else" in assessing Sanborn's credibility.  Finally, Skelton's questioning regarding Sanborn's trial strategy – standing alone – was also proper because Skelton knew of the reason for her appointment: the defendant's notice that he would use the EED defense.  In other words, she could ask about his strategy because she already knew what his strategy was.

However, Skelton's examination exceeded the boundaries of the subject for

46

which she was retained when she delved into a meeting and conversation with counsel as to which Sanborn had not waived confidentiality. *Estelle,* 451 U.S. 454 (court-appointed psychiatrist could not testify for prosecution on future dangerousness where defendant presented no psychological evidence and defense counsel was not notified that competency examination would encompass future dangerousness). While not necessarily improper when considered independently, Skelton's conjoined questions – about (1) Sanborn's meeting with his attorney and (2) his defense strategy – were tantamount to her asking what he and his attorney had discussed in that meeting. The unnecessary question about the meeting with counsel was not critical to her assessment of Sanborn's credibility and was a clear intrusion into the attorney-client relationship.

In rejecting Sanborn's claim, the Kentucky Supreme Court distinguished his case from *Estelle*, reasoning that because Sanborn did present psychological evidence, "the scope and admissibility of the expert's findings are not as limited as they were in *Estelle*." *Sanborn II*, 892 S.W.2d at 553. The Court held that "if the statements are necessary for the expert to formulate and explain her opinion, then the statements are admissible and are not violative of the defendant's rights." *Id.* It also found that:

> it was not improper for Dr. Skelton *to inquire of [Sanborn] as to why he changed his version of facts between interviews*. This information was helpful to Dr. Skelton in her evaluation of the appellant. Furthermore, the explanation was necessary for Dr. Skelton to explain the inconsistencies in the stories told to her by Sanborn.

47

*Id.* (emphasis added).  Assuming the Kentucky Supreme Court was correct that Skelton could inquire as to "why [Sanborn] changed his version of facts between interviews," Skelton did more here than just inquire about the reason for Sanborn's change of story.  Rather, after Skelton asked Sanborn why his factual account had changed over the weekend, and he answered her question, she then proceeded to ask him with whom he had met between their meetings.  That specific inquiry intruded into Sanborn's attorney-client relationship, even if her more general questions regarding the reason for his inconsistent stories did not.[6]

This court agrees that the scope of Skelton's examination was not as strictly limited as that in *Estelle*, because Sanborn presented contrary evidence and because Sanborn's counsel was aware that the psychological examination would go to the merits of his defense.  The court does not agree, however, that the scope of

---

[6]Even if Sanborn had volunteered the fact that he had talked with his attorney between meetings with Skelton, instead of Skelton's having directly elicited that information, this inadvertent intrusion into the attorney-client relationship would not alter this court's finding that there was an intrusion.  In *Bishop*, prison authorities unexpectedly discovered a statement written by the petitioner to his attorney when they searched his cell following an unsuccessful escape attempt by his cellmates.  *Bishop,* 701 F.2d at 1151.  In *Weatherford*, an undercover government informant attended discussions between a criminal defendant and his attorney after being invited to do so by that attorney. *Weatherford,* 429 U.S. at 548.

While the Sixth Circuit Court of Appeals and the United States Supreme Court reached different conclusions as to whether prejudice resulted from an intrusion in these cases, both courts held that an intrusion had occurred.  Thus, if an intrusion can occur by chance or even at the invitation of defense counsel, the court has no trouble concluding that an intrusion occurred here as the result of Skelton's direct questioning, even assuming the answer to her question was unexpected.

48

her examination was so expansive as to encompass the attorney-client meeting, which is clearly protected by the attorney-client privilege.  Privileged communications may often be helpful to experts like Dr. Skelton in formulating their opinions.  This fact, however, does not render such communications any less subject to protection.  She had enough information to doubt Sanborn's changed story from the two facts she already possessed: that he had earlier given a different version and that he was presenting an EED defense.  She had no reason to delve into his meeting with his attorney.  The court finds that Skelton's examination of Sanborn was an intrusion into Sanborn's relationship with his attorney, satisfying the first prong of the *Weatherford* analysis.

> b.     Weatherford's *Second Prong: Prejudice*

Since the court has found an intrusion into Sanborn's relationship with his attorney, the issue thus becomes whether that intrusion violated his Sixth Amendment right to effective assistance of counsel – that is, whether prejudice occurred as a result of the intrusion.  The Kentucky Supreme Court found that any interference with counsel resulting from Skelton's examination of Sanborn was constitutional because "the trial court went to great lengths to prevent the jury from hearing that the defense counsel visited the appellant in the time between his two interviews with Dr. Skelton."  *Sanborn II*, 892 S.W.2d at 553.  The Kentucky Supreme Court also conceded that "it would have been improper for Skelton to question Sanborn about his defense strategy *per se*," but concluded that to do so

49

was, at most, harmless error, because it "was given during the penalty phase at which time guilt had already been determined." *Id.* These conclusions are contrary to Sixth Circuit precedent, and the court finds that the testimony was both inappropriate and prejudicial.

In determining whether governmental interference with the attorney-client relationship rises to the level of a Sixth Amendment violation, courts consider four independent but interrelated factors: (1) whether the intrusion was the result of purposeful government conduct or was inadvertent; (2) whether the government obtained any information as a result of the intrusion that it later used at trial; (3) whether any information was otherwise used to the defendant's detriment; and (4) whether the government learned details of the defendant's trial preparation strategy by way of the intrusion. *Steele*, 727 F.2d at 586 (citing *Weatherford*, 429 U.S. at 554). "Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted." *Id.*; *see also Weatherford*, 429 U.S. at 558 (finding no Sixth Amendment violation where there was no tainted evidence or communication of defense strategy to prosecution; "[W]hen conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." *Id.* at 552.); *Sinclair v. Schriber*, 916 F.2d 1109, 1113 (6th Cir. 1990) (district court did not erroneously apply *Weatherford* in requiring showing of

50

prejudice).

In both *Weatherford* and *Steele*, an undercover agent overheard conversations between the defendant and defense counsel, but in neither case did the agent relate whatever information he learned from those conversations to the government or testify at trial to what he had heard.  *Weatherford,* 429 U.S. at 557-58; *Steele*, 727 F.2d at 586.  Both courts found that, because none of the four circumstances under which an agent's overhearing an attorney-client conversation might rise to a Sixth Amendment violation were present, a constitutional violation had not occurred.  *Weatherford*, 429 U.S. at 557; *Steele*, 727 F.2d at 586.

Applying the *Steele* analysis to the facts of this case, however, requires the opposite conclusion.  Even though the government did not instruct Skelton to elicit details about Sanborn's meeting with his attorney, the prosecution *did* make a conscious effort to convey that information to the jury in a damaging manner through its direct examination of Skelton.  There is a significant difference between Tustaniwsky's opening statement, in which he stated that the defendant killed Ms. Heilman because he was under EED, and Skelton's testimony, in which she related that Sanborn changed his story to one that supported his defense strategy after meeting with "someone."  Sanborn had already notified the government of his intent to present the EED defense, but it is his change-of-story after meeting with "someone" connected with that theory, rather than the mere fact of the existence of the defendant's theory, that the prosecution learned from Skelton.

51

The court must consider the development, presentation, and possible manipulation of Sanborn's defense as portrayed by Skelton's testimony. *See United States v. Danielson,* 325 F.3d 1054, 1074 (9th Cir. 2003) (strategy includes information concerning scope and nature of investigation, selection of witnesses, what questions to ask at trial, lines of defense to anticipate, and possible rebuttal). Dr. Skelton directly coupled a question about the attorney-client meeting with a question about Sanborn's strategy. By eliciting Skelton's testimony that Sanborn had altered his statements after talking to "someone," the prosecution unnecessarily conveyed privileged attorney-client information to the jury, thus prejudicing the defendant, and the court therefore finds that Skelton's testimony created an unconstitutional intrusion into Sanborn's relationship with his attorney.

The Sixth Circuit's opinion in *Bishop v. Rose* also supports the court's conclusion that Sanborn was prejudiced by Skelton's testimony about the meeting with "someone." In *Bishop,* the defendant's jail cell was searched because his cellmates had attempted to escape. *Bishop,* 701 F.2d at 1151. The jailers discovered a fourteen-page statement the defendant had previously written to assist his attorney, detailing his whereabouts on the day of the murder with which he was charged. *Id.* The jail gave the document to the prosecution, and the trial judge allowed the prosecution to use it to impeach the defendant's testimony. *Id.* at 1151-52. The federal district court found that "the document was a confidential communication between petitioner and his counsel and that Bishop clearly suffered

52

prejudice from the state's intrusion into the attorney-client relationship." *Id.* at 1154.

Assuming without deciding that the harmless-error doctrine applies to Sixth Amendment government-interference claims, the Sixth Circuit could not find beyond a reasonable doubt that the prosecution's reference to a confidential attorney-client communication at trial to show that the defendant had changed his story did not contribute to his conviction, and therefore held that the error was not harmless. *Id.* at 1157. In reaching its conclusion, the *Bishop* court first noted that *Weatherford* had been construed as holding that "a Sixth Amendment violation occurs if the government intentionally invades the attorney-client relationship *or privileged information resulting from an unintentional intrusion is disclosed and prejudice results.*" *Id.* at 1156 (citing *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979)) (emphasis added).[7] Turning to the "prejudice" prong of the constitutional analysis, the Sixth Circuit found that "the obvious way to establish prejudice resulting from a disclosure is to show that the information was used for the benefit of the government or the detriment of the defendant." *Bishop*, 701 F.2d at 1156 (citing *Weatherford*, 429 U.S. at 554; *United States v. Irwin*, 612

---

[7] The United States District Court for the Eastern District of Michigan recently considered *Bishop* and held that "in the absence of purposeful government involvement in the breach, the exploitation by the Government of evidence it obtains in violation of the attorney-client privilege is constitutionally permissible." *United States v. Marlinga*, 2005 WL 465432, *7 (E.D. Mich. Feb. 28, 2005). This court disagrees with that construction of *Bishop* and interprets *Bishop* as applying the government-interference doctrine to information inadvertently obtained but subsequently deliberately utilized by the government.

F.2d 1182, 1187 (9th Cir. 1980); *Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977)). The court then determined that standard had been satisfied because "the prosecutor used [Bishop's statement] . . . to give the impression that his testimony before the jury was different from something he has said in a written statement. . . . Though the time of [Bishop's] wife's return may not have been of great importance, *it was the use of a reference in the document to her return which enabled the prosecution to raise the inference that Bishop had changed his story.*" *Bishop*, 701 F.2d at 1157 (emphasis added). The Court also specifically rejected the prosecution's argument that confidential communications between a criminal defendant and his attorney could be used for impeachment purposes. *Id.*

Applying *Bishop*, this court finds that the use of privileged information in the penalty phase to portray to the jury Sanborn's motivation for changing his story was prejudicial. The testimony that Sanborn had changed his story after consulting with "someone" suggested that Sanborn was not actually acting under EED but had adopted the defense at the urging of his counsel and conjured a story to go along with it to avoid a harsher sentence; the use of Skelton's testimony about the meeting was thus analogous to the prosecution's use of the defendant's confidential statement to imply that he had "changed his story" in the *Bishop* case. The court recognizes that the only evidence of guilt in *Bishop* was circumstantial, whereas there exists direct evidence, discussed above, of Sanborn's guilt on the counts for which he was convicted. However, the improper testimony in this case

54

was relevant solely to the penalty phase, and as in *Bishop*, there was no physical evidence as to the validity of Sanborn's EED defense; its effectiveness depended entirely upon a credibility determination, which enhanced the detrimental effect of Skelton's testimony.  As in *Bishop*, Sanborn was not prevented from presenting his EED defense, but an improper interference with his attorney-client relationship substantially undermined his key argument against the imposition of the death penalty.[8]

In addition to the reasons given by the Kentucky Supreme Court, the Magistrate Judge reasoned that, because the jury had been informed in the defendant's opening statement that he had committed the murder under EED, the impact of Skelton's testimony was minimal.  Any prejudice, the Magistrate Judge concluded, stemmed from the fact that Sanborn "gave multiple versions of the events that occurred the night he murdered Ms. Heilman and that information was transmitted to the jury."  Magistrate Judge's Report and Recommendation, p. 76.  The court agrees that Sanborn was harmed by the disclosure of the fact that he

---

[8]For this reason, the court is also unpersuaded by the Kentucky Supreme Court's holding that any prejudice to Sanborn was harmless because Skelton's testimony was given during the penalty phase "at which time guilt had already been determined."  *Sanborn II*, 892 S.W.2d at 553.  Moreover, the United States Supreme Court has held that, "[g]iven the gravity of the decision to be made at the penalty phase, the State is not relieved of the burden to observe fundamental constitutional guarantees."  *Estelle*, 451 U.S. at 463 (citing *Green v. Georgia*, 442 U.S. 95, 97 (1979); *Presnell v. Georgia*, 439 U.S. 14, 16 (1978)).  Thus, although Sanborn's guilt was certain by the time the penalty phase of his trial began, the court finds that he was prejudiced by Skelton's testimony in the penalty phase and that prejudice was not harmless.

515 of 79 PageID #: 515

gave differing versions of what occurred at the crime scene and that, standing alone, any prejudice he suffered from the communication of that information to the jury would not amount to a violation of the Constitution. Indeed, the entire purpose of Skelton's testimony was to diminish Sanborn's credibility. But when Sanborn's change in strategy after meeting with "someone" was presented to the jury in support of Skelton's credibility determination, the intrusion into Sanborn's relationship with his attorney was used to his detriment and the resulting prejudice to Sanborn was then improper. As in *Bishop*, the prosecution in this case used confidential communications between a criminal defendant and his attorney to diminish that defendant's credibility and, thus, the likelihood of his defense's success, and, as in *Bishop*, the prosecution's actions were constitutionally impermissible.

In summary, the court finds that Dr. Skelton's interrogation of Sanborn regarding his meeting with his attorney combined with her questioning regarding his defense strategy amounted to an intrusion into the attorney-client relationship. The court also finds that this intrusion was prejudicial because it enabled the prosecution to use privileged attorney-client information to undermine Sanborn's case in the penalty phase. With both prongs of the *Weatherford* analysis having been satisfied, the court concludes that the government violated Sanborn's right to effective assistance of counsel and will grant his petition for a writ of habeas corpus on this ground.

### C.     Ineffective Assistance of Counsel

The Sixth Amendment guarantees a criminal defendant the assistance of an attorney whose performance ensures a fair trial and a reliable result. *Strickland v. Washington,* 466 U.S. 668, 685-86 (1984).  To prevail on an ineffective-assistance claim, a convicted defendant must prove that (1) counsel's performance was deficient, and (2) the deficiency was prejudicial to the defense.  *Id.* at 687.

To satisfy the deficiency prong of the test, the defendant must prove that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that "under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (*quoting Michael v. Louisiana,* 350 U.S. 91, 101 (1955)).  The reviewing court's assessment must consider the circumstances of the particular case at the time of the challenged conduct.  *Id.* at 690.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

"[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691. The standard for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of the imposition of the death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.[9]

Sanborn raised his ineffective-assistance claims in a motion to vacate, set aside, or correct his convictions and death sentence pursuant to Kentucky Rule of Criminal Procedure 11.42. The court found each claim to be without merit. On review, the Kentucky Supreme Court rejected each of Sanborn's arguments. *Sanborn III,* 975 S.W.2d 905.

### 1.    Failure to Present EED and Post-Mortem Sexual Contact Defenses

Sanborn contends that defense counsel at the second trial was ineffective in

---

[9] "Under federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh aggravating factors." *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003). Thus, in the context of a death sentence, the court asks whether "there is a reasonable probability that the jury would have weighed the mitigating and aggravating factors differently had counsel performed adequately." *Skaggs v. Parker,* 235 F.3d 261, 274 (6th Cir. 2000) (*cited by Hodge v. Commonwealth*, 68 S.W.3d 338, 345 (Ky. 2001)). Kentucky law, however, does not expressly require the jury to "weigh mitigating factors against aggravating factors." *Bowling v. Commonwealth*, 942 S.W.2d 293, 306 (Ky. 1997); K.R.S. 532.025.

conceding guilt but failing to present the EED defense and post-mortem sexual-contact defense at the guilt phase of that trial.[10]   Counsel's ability to present a defense was effectively eliminated when the trial judge ruled that Dr. Johnson's testimony was inadmissible.  Sanborn argues that an attorney has a duty to conduct reasonably broad research, and that Tustaniwsky's investigation as to the admissibility of Johnson's "triggering event" testimony was inadequate.  Sanborn argues that the alleged error was prejudicial because it is reasonably probable that he would have been convicted of a lesser offense and/or at least one juror would have believed that Sanborn had been acting under EED and he would not have been sentenced to death.

The Kentucky Supreme Court concluded that Tustaniwsky adequately prepared for the introduction of the EED defense by sending Sanborn "to Dr. Johnson for evaulation and obtain[ing] a court order requiring Dr. Johnson's presence at Dr. Skelton's interviews."  *Sanborn III,* 975 S.W.2d at 912.  The Court reasoned that, because *Strickland* does not allow the effectiveness determination to

---

[10] In his opening statement, Tustaniwsky stated, "Now every killing is not a murder.  If somebody kills someone while he is extremely emotionally disturbed it is not murder.  It is manslaughter.  And our evidence will show that Pat killed Barbara Heilman while he was extremely emotionally disturbed."  Tr. of Hr'g 3/27/91, pp. 22-23.  During the opening statement, as Tustaniwsky began to discuss Sanborn's history, the prosecutor objected that the information was irrelevant.  Tustaniwsky told Judge Shadoan that the information explained why Sanborn was emotionally disturbed that night and informed the judge and the prosecutor that "[w]e're going to have a psychologist testify as to what his diagnosis is based on and the diagnosis is based on the things that I'm mentioning....[Guilt] will be admitted through the psychologist."  *Id.* at 25.

be made in hindsight, "[s]trategic decisions in connection with pretrial rulings on admissibility are not sufficient to establish an ineffective assistance claim." *Id.* The Kentucky Supreme Court also found that Tustaniwsky did not err by conceding that Johnson's triggering-event opinion was based solely on his conversations with Sanborn. *Id.* Johnson testified to that effect, and the Court noted that effectiveness does not require an attorney to offer false testimony or make false statements about testimony. *Id.* (*citing Nix v. Whiteside*, 475 U.S. 157 (1986)).

The Magistrate Judge concluded that, even if Tustaniwsky's preparation was deficient, it was not prejudicial to Sanborn's defense, because the admission of Johnson's testimony would not likely have changed the result, particularly in light of the fact that Johnson did not believe Sanborn's story. There was also other evidence that the crime was premeditated, such as testimony that Sanborn wanted to "get her ass," and that he wanted revenge on Jack Heilman.

> a.    *Deficient Performance*

Sanborn relies on *Wiggins v. Smith* for his assertion that counsel was deficient in failing to perform sufficient legal research in preparation for presenting the EED defense. 539 U.S. 510 (2003). At sentencing upon convictions for first-degree murder, robbery, and two counts of theft, defense counsel in *Wiggins* presented evidence that Wiggins was not directly responsible for the victim's murder. *Id.* at 515. Although counsel told the jury that they would hear that the defendant had led a difficult life, the attorneys did not present any evidence of his

background.  *Id.* at 515-16.  Counsel argued that they had made a strategic decision: mitigating evidence would have detracted from the direct-responsibility argument at sentencing.  *Id.* at 515.

The Court asked "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." *Id.* at 523.  The reasonableness of an investigation depends "not only [on] the quantum of evidence already known to counsel, but also [on] whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. When a strategic decision is at issue, "a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Id.*  On the facts of the case, the Court decided counsel's choice fell short of prevailing professional standards.  *Id.* at 524.  The Court recognized a capital attorney's duty to attempt to discover all available mitigating evidence and found that the attorneys' failure to obtain the defendant's social history report, despite having had funds available for one, was unreasonable.  *Id.*

*Wiggins,* like many ineffective-assistance cases, focuses on the adequacy of investigation into mitigating evidence from the defendant's family and social background.  Sanborn's argument is that Tustaniwsky's research on the legal issues surrounding the admissibility of Johnson's testimony was inadequate.

The court ruled that Johnson "cannot testify to this triggering event," and "sustain[ed] the objection of the Commonwealth *to that effect only.*"  Tr. of Hr'g

4/3/91, p. 105 (emphasis added).  Judge Shadoan clarified,

> I'm not saying he can't testify, but he's not going to be able
> to testify as to what extreme emotional disturbance was
> related to him by the defendant occurred, unless has some
> factual evidence somewhere, even though it may be slight,
> that this act did occur, or this event, which he's basing it
> on.

*Id.* at 106.  After making his ruling, Judge Shadoan recognized that the issue was

not clear.  *Id.* at 110.

_____Tustaniwsky and Boyce were familiar with the cases regarding proof of EED.

*Id.*, at 68-73.  Defense counsel compared Johnson's proposed testimony to that

which would be offered in any case in which competency or sanity was an issue,

arguing that all mental-health experts use interviews with patients to form the basis

for their opinions, even though the subject matter of those interviews might not

otherwise be in evidence.  *Id.* at 81, 82, 88-89.  The trial court ultimately agreed

with the prosecution that the difference between a psychologist's testimony as to

insanity or competency and as to EED is that insanity or competency is strictly a

mental state, whereas testimony that the defendant was acting under EED requires

the expert to testify that a particular event occurred as the defendant claims it

occurred.  *Id.* at 96.  The court determined that to confirm that there was a

triggering event, another witness must testify as to its occurrence; the psychologist

may not rely solely on the defendant's self-serving statements.  *Id.* at 99, 105-106.

The Kentucky Supreme Court in *Sanborn III* found that incorrectly

anticipating an admissibility ruling could not be the basis for an ineffective-

assistance claim.  975 S.W.2d at 913.  Other courts have excused trial counsel's failure to anticipate a future ruling in another case.  *LeCroy v. Sec'y, Florida Dep't of Corrections*, 421 F.3d 1237, 1261 n.27 (11th Cir. 2005); *Kornahrens v. Evatt,* 66 F.3d 1350, 1360 (4th Cir. 1995); *Johnson v. Armontrout,* 923 F.2d 107, 108 (8th Cir. 1991); *Young v. Commonwealth*, 2005 WL 1415573, at *2 (Ky. Ct. App. June 17, 2005).  The Second Circuit has held that counsel was not ineffective in failing to move for suppression of evidence seized based on a search warrant where the warrant was subsequently invalidated in a civil proceeding based on the fact that a previous warrantless search had exceeded permissible limits.  *Indiviglio v. United States,* 612 F.2d 624, 628-29 (2d Cir. 1979).  The initial search had been in response to an emergency situation, and the court found that the attorney's failure to notice the detail of the scope of the initial search did not render his representation ineffective.  *Id.* at 629.

The exclusion of Johnson's testimony was justified, as discussed above, based on the conclusion that Sanborn's statements to him were not reliable and therefore did not make them the type of hearsay on which an expert's opinion may be based.  Johnson confirmed that he relies on patients' statements in forming his opinions, and the trial judge continued to explore that issue even at the sentencing phase.  Tustaniwsky was unaware that Johnson did not believe Sanborn's version of the events.[11]  Like the attorney whose inattention to detail was held excusable in

---

[11] At Sanborn's R.Cr 11.42 hearing, Tustaniwsky testified that he never asked Johnson and Johnson never told him that he did not believe what Sanborn

*Indiviglio*, Tustaniwsky failed to anticipate that Johnson's testimony was inadmissible because Sanborn's statements to him were unreliable. Reliability is a requirement in the expert opinion hearsay exception articulated in *Buckler*, 541 S.W.2d at 939, and Tustaniwsky's failure to anticipate the adverse determination on that factor was not objectively unreasonable.

Tustaniwsky's decision not to call Johnson to testify at all during the guilt phase of the trial was a reasonable strategic decision. Although Judge Shadoan was willing to allow Johnson to testify as to the statements against interest Sanborn made to him, Johnson was prohibited from stating his conclusion based upon those statements. Thus, Johnson's testimony would have merely reinforced Sanborn's admissions without the benefit of the psychological conclusion drawn therefrom. Furthermore, if the defense had called Johnson to testify, the prosecution could and almost certainly would have called Dr. Skelton on rebuttal to relate the varying versions of the story Sanborn had given to her. It was reasonable for defense counsel not to call Johnson other than by avowal during the guilt phase to prevent the admission of additional damaging testimony.

Sanborn recognizes that "the reasonableness of the decision [to concede guilt] depends in large part on defense counsel's preparation to present the EED and

---

had told him about the night of Ms. Heilman's murder, although Johnson might have stated that he was not sure whether it was true. Tr. of R.Cr. 11.42 Hr'g 8/12-13/96, at 346. Tustaniwsky admitted that the exclusion of Johnson's testimony rendered him without evidence to support the EED defense. *Id.* at 348-49.

post-mortem sexual contact defenses." The Supreme Court has recognized the strategic difficulties in representing defendants in capital cases:

> Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. In such cases, 'avoiding execution [may be] the best and only realistic result possible.' Counsel therefore may reasonably decide to focus on the trial's penalty phase at which time counsel's mission is to persuade the trier that his client's life should be spared.

*Florida v. Nixon,* 543 U.S. 175,191 (2004) (citations omitted).

The court finds that, viewing Tustaniwsky's strategic decision in the totality of the circumstances as they existed at the time the decision was made, it was not objectively unreasonable to admit guilt and rely on the EED and post-mortem sexual-contact defenses. As discussed above, counsel is not deficient for failing to correctly anticipate the pretrial admissibility ruling that ultimately foreclosed the EED defense at the guilt phase, and it follows that a decision rationally based on his presumption against that ruling cannot support an ineffective-assistance claim.

### b. Prejudice

Even if Tustaniwsky's failure to anticipate the inadmissibility of Johnson's testimony at the guilt phase of the trial had fallen below professional standards, the court would nonetheless reject that claim because that failure did not affect the outcome of the trial. Sanborn argues that

> [i]t is reasonably probable that at least one juror would have resisted the Commonwealth's efforts to execute Sanborn had the jury heard of the triggering event and Sanborn's

65

> EED defense…. Had defense counsel not been so
> ineffective, it is reasonably probable that the result at trial,
> especially the penalty recommended by the jury, would have
> been different.

Sanborn's argument makes vague reference to the outcome at the guilt phase of
the trial, but his emphasis is on the sentence ultimately recommended by the jury.

The Magistrate Judge found no prejudice based on the fact that Johnson did
not credit Sanborn's statements to him. Johnson's disbelief is a significant factor
in whether the exclusion of his testimony was prejudicial. *Austin v. Bell,* 126 F.3d
843, 848 (6th Cir. 1997) (uncertainty of potential witness's probable testimony
weighed against finding prejudice from defense counsel's failure to call him to
testify). The court also notes, however, that Johnson testified on avowal that he
does not undertake to determine which of a patient's conflicting stories is true; he
evaluates all of the statements in an attempt to assess the patient's mental state at
the time the events occurred. Even recognizing Sanborn's inconsistent stories,
Johnson remained firm in his opinion that Sanborn experienced significant rage and
anger.

The court finds, however, that the fact that Johnson did testify at the
penalty phase of the trial and the jury nonetheless sentenced Sanborn to death is
dispositive of the prejudice issue. At the penalty phase, Johnson was able to
convey to the jury his opinion that Sanborn had acted under an extreme emotional
disturbance when he killed Ms. Heilman, and the jury was not precluded from
considering his proposal as a mitigating factor. As Judge Shadoan remarked at the

66

R.Cr. 11.42 hearing, Johnson testified at length during the penalty phase, and he "was allowed to say everything he wanted to say practically.  But that jury still found the man guilty of the maximum crime and found him guilty without [Dr. Johnson's] testimony. *But then they issued the maximum after [Johnson's] testimony*."  Tr. of R.Cr.11.42 Hr'g 8/12-13/96, pp. 21-22 (emphasis added).

This court agrees with Judge Shadoan's suggestion that the fact that the jury sentenced Sanborn to death despite having the benefit of Johnson's testimony is probative that the jury would have convicted him of murder if they had heard the same testimony at the guilt phase.  Therefore, it is unlikely that the result of either phase of the trial would have been different but for Tustaniwsky's failure to anticipate the inadmissibility of Johnson's testimony at the guilt phase.

### 2.    Failure to Understand Scope of Attorney-Client Privilege

Sanborn pursues this claim as an alternative to his objections that Rev. Brown's testimony violated the attorney-client and priest-penitent privileges and that, without Brown's testimony, there was insufficient evidence to support his convictions for rape and sodomy.  Sanborn argues that Niemi should have better advised him regarding his communications with Brown, and that allowing Brown to have virtually unrestricted access to Sanborn constituted ineffective assistance. Sanborn believes that he was prejudiced by Brown's involvement in his defense, because, he argues, he would not have been convicted of rape and sodomy but for Brown's testimony at the second trial.  In addition, Sanborn contends that Brown's

testimony that Sanborn did not exhibit remorse for his actions likely weighed in favor of the jury's recommendation of the death penalty.

Sanborn proposes that Niemi neglected her duty to conduct reasonable investigation to ensure that information disclosed by her client was protected. *See Wiggins,* 539 U.S. 510 (duty to conduct reasonable investigation of facts and law); Ky. R. Prof. Conduct, S.C.R. 3.130(1.6), cmt. 3 (1990) ("client's confidences must be protected from disclosure"). The Kentucky Rules of Professional Conduct explain that "[t]he confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." *Id.*, cmt. 5. Sanborn points to the legal authority against the application of privilege in the situation with Brown as evidence that Niemi did not sufficiently research the applicable law. The Kentucky Supreme Court found that Niemi's misapprehension of the attorney-client and priest-penitent privileges as they applied to Sanborn's conversations with Brown did not violate the Sixth Amendment, because failure to anticipate a future evidentiary ruling does not constitute deficient performance. *Sanborn III*, 975 S.W.2d at 913.

The Magistrate Judge concluded that, even if Niemi's performance was deficient, her failure to impose greater restrictions on Sanborn's relationship with Brown did not prejudice Sanborn's defense. The Magistrate Judge reasoned that, because there was sufficient evidence to support Sanborn's conviction even without Brown's testimony, there is no reason to believe that the result of the trial

would have been different if his testimony had been excluded.  Sanborn contends that it is likely that the result would have been different, however, because Brown's testimony was the best evidence that Ms. Heilman was alive at the time of the sexual assault, and his testimony also gave the jury the most compelling reason not to spare his life.

### a.    Deficient Performance

_____Niemi contacted Brown because she considered offering his expert testimony as mitigating evidence at the penalty phase of Sanborn's first trial.  For the period during which Niemi intended to call Brown as an expert witness, Sanborn's statements to him could not have originated in confidentiality, because the basis of an expert's testimony must be disclosed to the jury.  Niemi's belief that the attorney-client privilege applied to their communications at that time was therefore in error.  However, her decision to retain his assistance was a reasonable strategy choice to prepare for the penalty phase, considering capital defense counsel's obligation to investigate potential mitigation factors.  *Carter v. Bell,* 218 F.3d 581, 596-97 (6th Cir. 2000) (failure to conduct such an investigation is deficient performance).  The court therefore finds no error in Neimi's decision to secure Brown's assistance during the course of the first trial; Niemi was fulfilling her obligation to pursue all possible avenues of mitigation, and her failure to foresee that Brown would contact the prosecution and testify in the second trial is not unreasonable.

69

Brown's discussions with Sanborn after Niemi informed him that his testimony would not be needed were not privileged, because they were neither expected to be held confidential nor made in furtherance of Sanborn's legal representation or in a penitential capacity.  Even if Niemi did not stress to Sanborn and Brown that their conversations should be maintained in confidence, her failure to do so did not render her assistance ineffective.  Once Brown was no longer a potential expert witness, both Sanborn and Niemi could have had an expectation of confidentiality.  Niemi clearly believed that Brown's conversations with Sanborn would remain confidential, and Sanborn has consistently argued that he had the same expectation.  Two justices of the Kentucky Supreme Court agreed with Sanborn's argument, and this court will grant a certificate of appealability as to the applicability of privilege to their conversations.  The dispute over the applicability of privilege to this situation, the capital attorney's duty to investigate mitigating evidence, and this court's opinion that it was not foreseeable that Brown would contact the county attorney and seek to testify against Sanborn in a retrial support the conclusion that Niemi's failure to predict that permitting Brown to meet with Sanborn would lead to his offering damaging testimony at the second trial was not below the standard of professional competence.  Her decision to retain him was well within reasonable professional judgment, and Sanborn's argument fails to rebut the presumption of effectiveness.

_____        b.     *Prejudice*

70

As the court concluded above with regard to the sufficiency of the evidence, the jury had sufficient evidence on which to convict Sanborn of rape and sodomy even absent Brown's testimony.  Given the heinous nature of Sanborn's actions, there was also sufficient evidence to support the imposition of the death penalty.  However, the standards applicable to the sufficiency-of-the-evidence analysis and the ineffective-assistance analyses are different.  Faced with a sufficiency-of-the-evidence objection, the reviewing court must affirm the conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  In contrast, the standard for prejudice is whether there is a reasonable probability that counsel's errors affected the outcome of the proceeding.  *Strickland,* at 694.  With respect to the death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.* at 695.

The "reasonable probability" requirement is less deferential than the "any reasonable trier of fact" inquiry, and the outcome of the sufficiency-of-the-evidence analysis is therefore not dispositive of the ineffective-assistance claim.  To establish prejudice as required for his ineffective-assistance claim, Sanborn must show that there is a reasonable probability that, if Niemi had correctly interpreted the rules of confidentiality and privilege as they applied to Sanborn's discussions with Brown

and Brown had therefore not testified against Sanborn at his second trial, Sanborn either would not have been convicted of rape and sodomy or would not have been sentenced to death.  The court finds that Sanborn has not demonstrated such a likelihood.  Brown did not testify against Sanborn in his first trial, yet the jury convicted him on rape and sodomy and recommended that he be sentenced to death.  It is likely that the jury in the second trial would have reached the same conclusion, particularly in light of the fact that Dr. Johnson, who testified for the prosecution at the first trial, offered testimony on the EED defense at the penalty phase of the second trial in favor of Sanborn, and the jury still recommended the death penalty.  Therefore, Sanborn's contention that Niemi violated his Sixth Amendment right to effective counsel is without merit.

### D.    Double Jeopardy

Sanborn's conviction in the first trial was reversed on the basis of prosecutorial misconduct.  The Kentucky Supreme Court found that each of three instances of misconduct would be independently sufficient to warrant reversal: (1) the erasure of the taped statements of witnesses who testified against Sanborn, (2) the use of the prosecutor's written version of Sanborn's recorded statements made immediately following his arrest, and (3) the prosecutor's use of investigative hearsay.

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const., amend. V.  In the

most basic sense, the Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense." *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 775 n.1 (1994).  Double jeopardy also protects a defendant's "freedom from extended anxiety, and the necessity to confront the government's case only once." *Oregon v. Kennedy*, 456 U.S. 667, 676-77 (1982).

The doctrine of double jeopardy bars a defendant from being retried after a conviction is reversed due to insufficient evidence. *Burks v. United States,* 437 U.S. 1 (1978).  Double jeopardy also prevents retrial following a declaration of a mistrial for prosecutorial misconduct. *Kennedy,* 456 U.S. 667.  Double jeopardy has not been found to apply, however, to reversals based on prosecutorial misconduct, which is what occurred following Sanborn's first trial. *Gully v. Kunzman*, 592 F.2d 283 (1979).

The distinction among reversals and mistrials and insufficient evidence and prosecutorial misconduct is based on a defendant's right to have his trial completed before a particular tribunal.  A defendant's interest in this cohesiveness is compromised by retrial following a declaration of mistrial but is not affected by a reversal after the first trial has proceeded to a verdict. *Id.* at 289-90.  When reversal is warranted because there was insufficient evidence to support a conviction, subjecting the defendant to a second trial is unconstitutional, because

the trial should not have gone to completion; the jury should not have been called

upon to render a verdict if there was insufficient evidence to support one. *Burks*,

437 U.S. at 16.  The court in *Burks* explained that reversal for trial error as

opposed to insufficient evidence

> implies nothing with respect to the guilt or innocence of the
> defendant.  Rather, it is a determination that a defendant
> has been convicted through a judicial process which is
> defective in some fundamental respect ....  When this
> occurs, the accused has a strong interest in obtaining a fair
> readjudication of his guilt free from error, just as society
> maintains a valid concern for insuring that the guilty are
> punished.

*Id.* at 15.  When a conviction is reversed for failure of the evidence, the bar against

retrial does not prejudice the government, because the government has already had

a fair chance to prove its case.  *Id.* at 16.

  If the prosecution goads the defendant into requesting a mistrial, double

jeopardy acts to prevent a retrial. *Kennedy*, 456 U.S. at 676.  Sanborn claims that

the prosecutor's misconduct in his first trial was motivated by such an intent.

Sanborn argues that, even though his conviction was reversed rather than a mistrial

having been declared, double jeopardy should nonetheless attach because a mistrial

was warranted.  Sanborn contends that the focus should be on the prosecutor's

intent, and that if the prosecutor intended to goad the defendant into asking for a

mistrial, double jeopardy should prevent a retrial whether a mistrial was requested

or not.

  The Kentucky Supreme Court did not address Sanborn's double-jeopardy

argument, finding that it did not present a "relatively serious" question or cause "real concern." *Sanborn II,* 892 S.W.2d at 546.  The Magistrate Judge rejected Sanborn's appeal on this ground, because there is no clearly established Supreme Court precedent, as required for granting habeas relief, applying double jeopardy to reversals for prosecutorial misconduct, regardless of the prosecutor's intent.  Most courts that have addressed the issue have found that *Kennedy* does not apply in situations where no mistrial was granted, and thus the Kentucky Supreme Court's interpretation of the Supreme Court's relevant opinions cannot be deemed unreasonable. *United States v. McAleer,* 138 F.3d 852, 855-56 (10th Cir. 1998) (no double jeopardy bar where mistrial not actually granted); *United States v. Doyle,* 121 F.3d 1078, 1085 (7th Cir. 1997) (declining to extend *Kennedy* to situations in which mistrial was not granted); *United States v. Singleterry,* 683 F.2d 122, 124 (5th Cir. 1982) (double jeopardy not implicated where mistrial due to prosecutorial misconduct not declared); *Ohio v. Keenan,* 689 N.E.2d 929, 940 (Ohio 1998) (*Kennedy* does not apply to retrials after reversal); *North Carolina v. Sanderson*, 488 S.E.2d 133, 142 (N.C. 1997) (vacation of sentence and remand not equivalent to mistrial for purposes of double jeopardy).  *But see United States v. Wallach,* 979 F.2d 912, 915 (2d Cir. 1992) (suggesting *Kennedy* might apply to reversal based on misconduct intended to prevent likely acquittal, even though no mistrial granted).  The Sixth Circuit has held that double jeopardy does not bar a retrial after reversal for reasons other than prosecutorial misconduct. *Walls v.*

75

*Hemingway,* 27 Fed. Appx. 553, 555-56 (6th Cir. 2001) (not addressing whether reversal for prosecutorial misconduct would bar retrial); *see also Greyson v. Kellam,* 937 F.2d 1409, 1414-15 (9th Cir. 1991) (*Kennedy* inapplicable where conviction vacated on grounds other than those cited in motion for mistrial).  This court concurs with the Magistrate Judge's reasoning and disposition of this claim of error and finds that, because the Kentucky Supreme Court's decision that double jeopardy did not apply to bar Sanborn's second trial after his first conviction was reversed for prosecutorial misconduct was not unreasonable, Sanborn is not entitled to relief on this claim.

### E.   Remaining Claims of Error

As to the remaining arguments, upon a review of the record, the court defers to the Magistrate Judge's reasoning and conclusion, and will deny the petitioner's application on those grounds.

## III.   CERTIFICATE OF APPEALABILITY

There is no automatic right to appeal a district court's denial of an application for a writ of habeas corpus; the petitioner must seek and obtain a certificate of appealability from the district court.  28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003).  A certificate of appealability is available only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A substantial showing exists where "jurists of reason could disagree with the district court's resolution of his constitutional claims

or ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 532 U.S. at 327.

Reasonable jurists could disagree with this court's resolution of the claims concerning (1) whether the admission of Rev. Brown's testimony violated the attorney-client privilege and the Fourteenth Amendment right to due process; (2) whether the admission of Brown's testimony violated the priest-penitent privilege and the Fourteenth Amendment right to due process; and (3) whether Brown's testimony violated the Sixth Amendment because it constituted government interference with the right to counsel.  The court adopts the Magistrate Judge's explanation as to these claims.  The court also adopts the Magistrate Judge's rationale with respect to the denial of a certificate of appealability on all remaining claims.  The court need not address the availability of a certificate of appealability as to whether Dr. Skelton's testimony constituted unconstitutional governmental interference with the right to counsel in contravention of the Sixth Amendment, because the court will grant the defendant's petition for a writ of habeas corpus on that ground.

## IV.    FURTHER PROCEEDINGS

The court, having granted Sanborn's petition for a writ of habeus corpus with regard to the admission of Skelton's testimony during the penalty phase of his second trial, will vacate Sanborn's sentence of death and remand this matter to the state trial court for further proceedings in accordance with this opinion.  As the

admission of Skelton's testimony affected only the penalty phase of Sanborn's second trial and the court has found his remaining claims meritless, the court will affirm his convictions for intentional murder, first-degree kidnapping, first-degree rape, and first-degree sodomy.

## V.    CONCLUSION

The court **ADOPTS** the Magistrate Judge's Report and Recommendation (DE 130) with the modifications discussed above.

**IT IS ORDERED** that the petitioner's application for a writ of habeas corpus (DE 35) is **GRANTED IN PART** and **DENIED WITH PREJUDICE IN PART**.  The application is **GRANTED** as to the petitioner's claim that the admission of Dr. Skelton's testimony at the penalty phase of the second trial, as detailed above, constituted unconstitutional governmental interference with the right to counsel in violation of the Sixth Amendment.  The application is in all other respects **DENIED.**

**IT IS FURTHER ORDERED** that the petitioner's sentence of death is **VACATED**, his convictions for intentional murder, first-degree kidnapping, first-degree rape, and first-degree sodomy are **AFFIRMED**, and this matter is **REMANDED** to the state trial court for further proceedings.

**IT IS FURTHER ORDERED** that a certificate of appealability shall issue with respect to:

(1)    Whether the admission of Rev. Brown's testimony violated the attorney-client privilege in contravention of Sanborn's Fourteenth Amendment right to Due Process;

(2)     Whether the admission of Rev. Brown's testimony violated the priest-penitent privilege in contravention of Sanborn's Fourteenth Amendment right to Due Process; and

(3)     Whether the admission of Rev. Brown's testimony constituted an unconstitutional governmental interference with the Sixth Amendment right to counsel.

Signed on  February 14, 2007

*Jennifer B. Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**

79